**ILAPAK RESEARCH & DEVELOPMENT S.A., a Swiss corporation; and Ilapak, Inc., a Delaware corporation, Plaintiffs,**

**v.**

**RECORD SpA., an Italian corporation; and Giuseppe Fioravanti, an individual, Defendants.**

**No. 90 C 6594.**

United States District Court, N.D. Illinois, E.D.

Feb. 21, 1991.

Alan I. Becker, Mitchell H. Frazen, Burditt, Bowles & Radzius, Chartered, Chicago, Ill., for plaintiffs.

Raymond I. Geraldson, Jr., John Thompson Brown, Pattishall, McAuliffe, Newbury, Hillard & Geraldson, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIAN BARNETT DUFF, District Judge.

This case came before the court on the motion of Ilapak Research & Development (Ilapak R & D) and Ilapak, Inc. (Ilapak) for a temporary restraining order against the defendants Record SpA. and Giuseppe Fioravanti. The court granted the motion and set the case for hearing on the parties' cross motions for preliminary injunction. The matter came before the court for a hearing without a jury on January 15, 1991. The court has heard the evidence and considered the testimony, exhibits, memoranda of law, and arguments of counsel. Now fully advised in the matter, the full hearing having been concluded, the court makes the following findings.

## FINDINGS OF FACT

1. Ilapak R & D is a foreign corporation organized under the laws of Switzerland, with its principal place of business in Montagnola–Lugano, Switzerland. Ilapak R & D develops packaging equipment.

2. Ilapak is a Delaware corporation with its principal place of business in Newtown, Pennsylvania. Ilapak sells and services packaging equipment.

3. Ilapak formerly did business under the name "Systempak".

4. Record SpA. (Record) is a foreign corporation organized under the laws of Italy, with its principal place of business in Italy.

5. Mr. Fioravanti is an individual citizen of Italy. He is an officer, director or controlling shareholder of Record.

6. This is an action for injunctive relief and damage by plaintiffs based upon infringement of federally registered trademarks and unfair competition under the Lanham Trademark Act of 1946 (15 U.S.C. §§ 1051–1127), and for dilution, deceptive trade practices and unfair competition under the laws of the State of Illinois. The defendants have asserted counterclaims of unfair competition under the Lanham Act, common law infringement and passing off, and dilution and deceptive trade practices under Illinois law. Defendants seek declaratory and injunctive relief.

7. Jurisdiction is proper in this court pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338(b). Neither party has contested venue or personal jurisdiction.

8. In 1965, Mr. Fioravanti perceived a need in the market for a packaging machine, and developed one.

9. He entered a partnership with a local shop owner, Mr. Piazza, to produce the packaging machines he had developed.

10. Mr. Fioravanti ended his relationship with Mr. Piazza in 1971 and assumed full control of the Record Company, through which he continues to do business.

11. Record sold its first machine under the "AUDAX" trademark, through Alfred and Company, Ltd.

12. Record also adopted and used, among others, the "MK 1" and "JAG" trademarks.

13. Mr. Fioravanti testified, and this court found his testimony to be highly credible, that Record began to use the "JAGUAR" trademark on its packaging equipment in 1973.

14. As part of its establishment of a "family" of animal name trademarks used for its packaging equipment, Record subsequently adopted and began to use the PANDA and PANTERA trademarks.

15. In 1970 Record decided to market its machines worldwide through various distributors, and in furtherance of that marketing strategy, which. Mr. Fioravanti credibly testified is common in the industry, Record decided to enter into an agreement with Roger Levy, a founder of Ilapak

and Ilapak R & D, for distribution of Record's machines.

16. Ilapak was responsible for the bulk of the marketing in the United States. Record, however, paid for the photography of its machines used in advertising brochures, and for the layout of those brochures. Ilapak has used some of those photographs in the brochures it distributes advertising Record's machines. For the most part, however, Ilapak itself created and financed the brochures it used to advertise the machines.

17. When Ilapak found a buyer for Record packaging equipment, it sent the buyer's specifications for a machine meeting its particular needs to Record (approximately 65% of each machine is standard, while the remaining parts are customized to meet the needs of a specific customer— there is no "stock" machine). Record then manufactured the machine and sold it to Ilapak. Ownership was transferred in Italy, not the United States.

18. Mr. Levy testified that Ilapak had its own independent specifications for the packaging machines, in addition to the customer specifications. Mr. Fioravanti testified that this was not so. The court finds Mr. Fioravanti's testimony on this point to be more credible than Mr. Levy's, and accepts it as true.

19. Ilapak took responsibility for service to the machines. Customers turned to Ilapak, not Record, when they had problems with their packaging equipment.

20. It was Record, however, rather than Ilapak, that took responsibility for quality control. It did it in several ways:

a. Record designs and builds each machine;

b. Record prepares additional specifications for each machine, according to the specific needs of each customer;

c. Record tests all machines before they leave the factory;

d. Record trained Ilapak's technicians who were responsible for installing and servicing Record's machines;

e. Record occasionally permits customers to visit its factory where it manufactures its machines.

21. It was quite clear to the customers that the machines came from Record. Record's name, not Ilapak's, was affixed to the machines immediately above the trade name. Ilapak's name was also on the machine, but not in proximity to the trademark.

22. Ilapak once removed Record's name and trademarks from Record machines on display at a trade show. When Record protested, Ilapak agreed to replace the name and trademarks.

23. Record and Ilapak never memorialized their agreement in a written contract and their relationship ended for the most part in October, 1988, although Ilapak did distribute a few Record machines in 1989.

24. In 1989 Ilapak R & D registered the trademarks "PANDA", "PANTERA" and "JAGUAR" with the United States Patent and Trademark Office, as follows:

| Mark | Regist. No. | Date | Goods or Services |
|---|---|---|---|
| Panda | 1,558,789 | 10/3/89 | Packaging machines |
| Pantera | 1,569,279 | 12/5/89 | Packaging machines |
| Jaguar | 1,578,639 | 1/23/90 | Packaging machines |

25. Record exhibited packaging machinery bearing the above marks at a trade show in Chicago on November 12, 1990. Ilapak sought a temporary restraining order to prevent Record from displaying the marks on its machines. Record did not appear at the hearing and on the basis of Ilapak's argument and documentation that it was the owner of the marks, on November 13, 1990 this court granted Ilapak's motion for a temporary restraining order.

## CONCLUSIONS OF LAW

The court, in deciding whether to grant a preliminary injunction, must consider five points:

1. whether the plaintiff has an adequate remedy at law;
2. whether the plaintiff will suffer irreparable harm if the preliminary injunction is not issued;
3. whether the irreparable harm plaintiff will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted;
4. whether the party seeking the injunction has a reasonable likelihood of succeeding on the merits; and
5. whether the injunction will harm the public interest.

*International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988), *Illinois Psychological Association v. Falk*, 818 F.2d 1337, 1340 (7th Cir.1987). The Seventh Circuit has instructed the courts to evaluate these points on a "sliding scale"—meaning that the greater the potential harm to the plaintiff if the injunction does not issue, and the lesser the harm to the defendant if it does, the less weight the court need place on the plaintiff's likelihood of success on the merits. *Id.* This court will consider each factor in turn.

### Adequate Remedy at Law and Irreparable Harm

The questions whether either party has an adequate remedy at law or will be irreparably harmed should the court decline to issue an injunction in its favor are sufficiently related that they are most efficiently discussed together. In trademark cases in general, and this one in particular, the issue is simply disposed of. "[T]he damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir.1982). See also *International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091–92 (7th Cir. 1988). Here, the dispute is the ownership of the marks "Panda", "Pantera" or "Jaguar". Only one party is entitled to use of the marks, though both were using them until this court issued a temporary restraining order. The party which has the right to the marks is irreparably harmed by the party which does not. Thus the first two prongs of the test for issuance of a preliminary injunction are satisfied—by whom is a question the court will consider below.

### Balance of Harms

The question who will suffer the greater harm by the issuance of a preliminary injunction is also easily, if somewhat cryptically, answered. Whichever party is not permitted to continue using the marks will likely lose a substantial portion of its business—for both parties contend that they have built a reputation behind the marks. The harm to Record would be somewhat greater since its business does not appear to be as diversified as Ilapak, but for purposes of this opinion and because there was a paucity of evidence presented at the hearing on the question, the court will assume the relative harms to be roughly equal.

### Public Interest

It is well established that the public interest is served by the protection of trademarks. See e.g., *International Kennel Club*, 846 F.2d at 1092 n. 8; *A.J. Canfield v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir.1986); *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976). Thus, this court's vindication of the (likely) true owner of the marks in issue is in the public interest.

### Likelihood of Success on the Merits

The only remaining question then (and of course, the most critical one) is which party is likely to succeed on the merits. That party will be entitled to the injunction, since as this court has discussed above, it will have met each of the other enumerated factors. The court notes as an initial matter that the marks "Panda", "Pantera" and "Jaguar" are legitimate trademarks. The Patent and Trademark Office (PTO) has so decided by registering them. The marks are "arbitrary or fanciful", rather than "descriptive" and thus clearly entitled to trademark protection. See *G. Heileman Brewing Co. v. Anheuser–Busch, Inc.*, 873 F.2d 985, 991–92 (7th Cir.1989).

The critical issue is the ownership of the marks "Panda", "Pantera" and "Jaguar" for use on packaging machines. Ilapak has registered them in the United States and is therefore entitled to a presumption of ownership. See Lanham Act § 7(b), 15 U.S.C. § 1057(b) (1975).[1] It was that presumption upon which the court relied when it issued the temporary restraining order in this case. A presumption, of course, is only that and Record could rebut it by showing that Ilapak fraudulently obtained the registration or that Ilapak's use of the marks misrepresents the actual source of the machines. See 15 U.S.C. § 1115(b)(1) and (2).

So the court returns to the question it has already identified—who owns the marks? The parties agree that Record manufactured and Ilapak sold machines bearing the "Panda", "Pantera" and "Jaguar" marks. Record would have the court characterize it as a manufacturer and Ilapak as a distributor—Ilapak says it was more than a distributor, since it was the company which advertised and sold to the users of the machinery, provided specifications to Record for each particular user and serviced the machinery.[2] Furthermore, Ilapak urges its priority because it took possession of the machines in Italy, making Ilapak the only company which has used the trademarks in American commerce.

Record's argument is that it is the manufacturer of the goods bearing the marks, the "senior" user and therefore rightful owner of the marks and that Ilapak is simply a distributor run amok, trying to appropriate marks rightfully belonging to Record. The court need not decide at this juncture the precise nature of the parties' relationship since Ilapak has conceded that the analysis of the question of ownership of the marks would be the same whether or not Ilapak was a distributor.

■■■ As between a foreign manufacturer and an exclusive United States distributor, courts have held that the foreign manufacturer is presumed to be the owner of the mark absent some other agreement.[3] See *Global Maschinen GmbH v. Global Banking Systems, Inc.*, 227 U.S.P.Q. 862, 866 and cases cited therein. See also 1 J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 16:16 at p. 763 (2d ed. 1984). An exclusive distributor may rebut that presumption in the absence of a written agreement by showing that the goods are manufactured for it, that it controls their production or that the goods pass through its hands in the course of trade and that it gives the goods the benefits of its reputation, name or business style. *Energy Jet, Inc. v. Forex Corp.*, 589 F.Supp. 1110, 1116–17 (E.D.Mich.1984), *Wrist–Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 516 F.2d 846 (8th Cir.1975). One commentator has described the legal standard as follows:

> The use of a trademark does not necessarily and as a matter of law import that the articles upon which it is used are manufactured by its user. It may be enough that they are manufactured for him, that he controls their production, or even that they pass through his hands in the course of trade, and that he gives to them the benefit of his reputation, or of his name and business style. The decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it.

Callman, *Unfair Competition, Trademarks and Monopolies*, § 17.16 (4th Ed.,

---

**1.** That section provides: "A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate subject to any conditions or limitations stated in the certificate."

**2.** The parties never entered a contract governing the use of the marks—in fact, they apparently did not memorialize any part of their relationship with a written contract.

**3.** The question which party created the marks in issue was disputed during the preliminary injunction hearing. As the court's discussion makes clear, even if Ilapak created the mark it would not change the court's analysis, although in fact the court credits Mr. Fiorovanti's testimony that he was the creator.

1981); see also *Wrist–Rocket Manufacturing Co.*, 516 F.2d 846, 851; *Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 269 F. 796, 806 (D.Del.1920); *Victor Tool & Machine Corp. v. Sun Control Awnings, Inc.*, 299 F.Supp. 868, 874 (E.D.Mich.1968), aff'd 411 F.2d 792 (6th Cir.1969).

■ One way to decide which "business or article" is symbolized by a particular trademark is by examining "customer perception". The distributor could establish ownership by demonstrating that customers associate it, rather than the manufacturer, with the marks in issue. McCarthy at 757–758. As this court noted in its findings of fact, however, the fact that Ilapak sold and serviced the machines did not necessarily mean that customers associated Ilapak with the marks. Rather, Record placed its name in closest proximity to the marks, and the court finds that a reasonable customer would have associated Record, rather than Ilapak (whose name appeared in an entirely different part of the machine, well separated from the marks), with those marks.

Another avenue open to Ilapak is to demonstrate that it, rather than Record, exercised control over the quality of the machines (see McCarthy, § 16:16 at p. 762 (2d ed. 1984)), but again, this argument must fail. Record built the "core" machine, which it modified to meet a particular customer's specifications. Ilapak would have this court characterize the specifications as Ilapak's, but that is clearly not the case. Ilapak and Record's relationship was such that Ilapak knew what information Record required in order to build a machine to meet a particular customer's needs. Ilapak provided that information and Record built the machine. Ilapak did not have its own, independent specifications with which it required Record to comply.

As the court noted above, Record created the "core" machine. In order to serve more than one type of customer, it was necessary to customize the machine to meet different manufacturers' needs (a machine that wraps frozen pizzas would ill serve a candy-bar manufacturer). Ilapak found the customers, and conveyed their individual needs to Record but, just as a person who buys a car from a particular dealership (even one who promises to service and repair the car forever) knows that it is purchasing a Ford or a Chevy—not an Al Piemonte. The Record "core" is the critical, constant in all the machines, and the customers knew it.

Because Record manufactured the machines bearing the disputed marks, because it exercised control over the quality of the goods bearing the marks and because customers associated Record, rather than Ilapak with the marks, the court finds that Ilapak's use of the marks misrepresents the source of the goods bearing the marks. Accordingly, the court denies Ilapak's motion for a preliminary injunction and grants Record's cross-motion for preliminary injunction.

Therefore, pending final determination of this action at trial or further order of this court, Ilapak Inc. and Ilapak R & D are, and each of them, and each of their officers, agents, servants and employees, and all those persons with actual knowledge of this order in active concert or participation with them are hereby preliminarily enjoined and restrained:

(A) from using, displaying, or exhibiting in any manner the marks "Panda", "Pantera", or "Jaguar" alone or in combination with any other words or phrases in the sale, offering for sale, distribution, promotion or advertising of packaging machinery;

(B) from importing into United States commerce at any customhouse of the United States any packaging machinery bearing the marks "Panda", "Pantera" or "Jaguar" alone or in combination with any other words or phrases in the sale, offering for sale, distribution, promotion or advertising of packaging machinery;

(C) to immediately remove, cover over, or mark out in a permanent manner the marks "Panda", "Pantera" or "Jaguar" alone or in combination with any other words or phrases from all name plates, labels, signs, prints, packages, wrappers, receptacles, advertisements and other written and graphic materials connected with

the sale, offering for sale, distribution, exhibition or advertising of defendants' packaging equipment in the United States;

(D) doing any other act or thing likely to confuse, mislead or deceive their customers or members of the public into believing that their merchandise emanates from, is connected with, sponsored or approved by Record;

(E) destroy or otherwise dispose of any merchandise, documents or materials relating thereto which bear the marks "Panda", "Pantera" or "Jaguar", alone or in combination with any other words or phrases within thirty days after service upon them of this order.

Neither party having requested one, a bond is not required to secure this order.

This Preliminary Injunction Order shall continue in force and effect until the entry of a further order upon the conclusion of a trial on the merits of plaintiffs' claims and defendants' counterclaims, or upon other further order of this court.