**TMT NORTH AMERICA, INCORPORATED, Plaintiff–Appellee,**

v.

**MAGIC TOUCH GmbH, Defendant–Appellant.**

**No. 97–1894.**

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1997.

Decided Sept. 4, 1997.

Rehearing Denied Oct. 8, 1997.

George W. Hamman, Marvin Benn (argued), Dawn M. Cassie, Hamman & Benn, Chicago, IL, for Plaintiff–Appellee.

Carol A. Genis, Robert T. Johnson, Jr., Sana Hakim, Bell, Boyd & Lloyd, Chicago, IL, Glenn F. Ostrager (argued), Dennis M. Flaherty, Joshua S. Broitman, Ostrager, Chong & Flaherty, New York City, for Defendant–Appellant.

Before CUMMINGS, KANNE and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

This case involves a trademark dispute between a German company that developed a product and an American company that distributed it. Both companies claim ownership of two trademarks associated with the product. The American company, TMT North America ("TMT–2"), asserts that it now owns the trademarks because the German company, The Magic Touch GmbH[1] ("TMT GmbH"), acted inequitably when TMT–2 purchased the assets of the prior U.S. distributor, a company also named TMT North America ("TMT–1"). Both parties consented to disposition by a magistrate judge (pursuant to 28 U.S.C. § 636(c)), and after an evidentiary hearing, the magistrate judge issued a preliminary injunction in favor of TMT–2. *See TMT North America, Inc. v. The Magic Touch GmbH*, No. 96 C 4502, 1997 WL 136315 (N.D.Ill. Mar.18, 1997). The magistrate judge found that although TMT GmbH never transferred ownership of the trademarks to TMT–1, TMT–2 had shown a likelihood of success regarding whether TMT GmbH forfeited its rights to the marks by its conduct during TMT–2's purchase of TMT–1's assets. The magistrate judge therefore enjoined TMT GmbH from using the marks or asserting any ownership rights to them. On TMT GmbH's motion, we stayed the preliminary injunction pending appeal. We now vacate the injunction outright, finding that any acquiescence by TMT GmbH could not have forfeited all rights to the marks, but rather could only have put TMT–2 on equal standing with TMT GmbH regarding usage of the marks.

## I. HISTORY

TMT GmbH is a German company that has developed a specially-coated paper for use in transferring images onto fabrics. Color photocopiers can transfer images onto the paper, and with the use of heat and pressure, the images can be transferred from the paper to the fabric. In 1990, TMT GmbH

entered into an agreement with TMT–1, making TMT–1 the exclusive North American distributor of TMT GmbH's image transfer products. The distribution agreement stated that TMT–1 was "required to display the trademark and instructions supplied by TMT [GmbH] on all promotional materials, packaging and any other related materials produced by [TMT–1] in a manner agreed upon by both parties prior to production." TMT GmbH thereafter shipped the image transfer paper to TMT–1, which distributed the paper under the two trademarks at issue in this case, "The Magic Touch" and "The Magic Touch ... my one and only." Initially, TMT GmbH shipped the paper in its final form to TMT–1 for distribution. By the beginning of 1992, however, TMT GmbH began to ship only rolls of the raw paper from its French manufacturer, and TMT–1 would then have the paper converted into individual sheets and packaged for sale.

Early on in this contractual relationship, TMT–1 filed an application to register "The Magic Touch ... my one and only" with the U.S. Patent and Trademark Office. TMT–1's president and vice president both testified that they always understood TMT GmbH to own the trademarks, but TMT1's chairman of the board, Martin Schwartz, filed a federal trademark application that listed TMT–1 as the owner. Schwartz had discussions with TMT GmbH's principal, Juergen Hagedorn, regarding the registration, but it is unclear whether Hagedorn knew the registration was in TMT–1's name rather than TMT GmbH's. Schwartz testified that Hagedorn knew TMT–1 was filing on its own behalf, but Hagedorn denied such knowledge.

Over approximately the next two years, TMT–1's business did not go well. At one point in 1991, Hagedorn scheduled a meeting with TMT–1 to discuss conditions for continuing the business relationship. One of the conditions Hagedorn put on the agenda was for "[a]ll trademark applications" to be assigned to TMT GmbH. The agenda, however,

---

1. GmbH is the acronym for "Gesellschaft mit beschrankter Haftung," which translated literally from German means "company with limited liability." A GmbH is typically a privately-held company and is a procedurally less stringent form of company than a German stock corpora-
tion, or Aktiengesellschaft (AG). A GmbH is somewhat analogous to an American limited liability company. *See generally* Ingrid Lynn Lenhardt, *The Corporate and Tax Advantages of a Limited Liability Company: A German Perspective*, 64 U. Cin. L.Rev. 551 (1996).

did not state specifically which applications would have to be assigned, nor did it state whether GmbH expected the trademark rights themselves (as opposed to the trademark applications) to be transferred.

When TMT–1 fell behind in its payments to TMT GmbH, three new investors were recruited to put money into either TMT–1 or its distribution arm, TMT Services, Inc. All three of these investors testified that they understood TMT–1 to own the trademarks and that Hagedorn, who was involved with recruiting the investors, never said anything to suggest otherwise. In late 1992, one of these investors, along with three new investors, formed TMT–2 which acquired the assets of TMT–1. In the Asset Purchase Agreement, TMT–1 explicitly represented that it owned and was transferring the trademarks. TMT GmbH was not a party to the Asset Purchase Agreement, but it did enter into a Memorandum of Agreement with the TMT–2 investors. The Memorandum called for the parties to sign a distributorship agreement and for the new company to pay TMT GmbH substantial consulting fees.

One of the new investors, Jerald Lavin, testified that his discussions with Hagedorn regarding the new arrangements led him to believe that TMT–1 had owned the trademarks. Hagedorn, by contrast, pointed to two drafts of a distribution agreement that Lavin prepared in November 1992 following the Memorandum of Agreement. Those drafts state that TMT GmbH "warrants and represents that it has sole right and interest in the . . . registrations (Exhibit B) of trademarks" to be assigned to TMT–2 as part of the distributorship agreement. No exhibits, however, are attached to the drafts, leaving it somewhat uncertain whether Lavin was referring to the trademarks at issue in this litigation.

Despite these drafts, TMT GmbH and TMT–2 were unable to negotiate a distributorship agreement. In February 1993, TMT GmbH sent TMT–2 a letter terminating the Memorandum of Agreement and a second letter stating that "no Intellectual Art, Patents and/or Trademarks and/or related rights have been traded, transferred, provided and/or assigned." Both parties, meanwhile, attempted to secure federal trademark registrations. In February 1993, TMT–1 filed a federal trademark application for "The Magic Touch" (which was granted in 1994), and in April 1993, TMT GmbH filed its own federal trademark application (which apparently was unsuccessful). Nonetheless, TMT GmbH and TMT–2 continued their distribution relationship without a written contract until June 1996 when TMT–2 terminated its distributorship and filed suit against TMT GmbH. TMT–2 now has its own source of the raw paper product and thus no longer needs TMT GmbH's paper.

TMT–2's complaint pleaded numerous counts against TMT GmbH, invoking § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), § 35 of the Lanham Act (15 U.S.C. § 1117), and the state common-law torts of unfair competition and interference with business relationships. TMT–2 specifically requested a declaratory judgment establishing its ownership of the trademarks, both preliminary and permanent injunctive relief preventing TMT GmbH from using the marks in any way, and damages. TMT GmbH responded by filing 13 similar counterclaims, and both parties filed motions for preliminary injunctions.

In January 1997, the magistrate judge held a lengthy evidentiary hearing. In March, the magistrate judge ruled that TMT–2 was entitled to a preliminary injunction. The magistrate found the evidence convincing that "TMT GmbH knew that TMT–1 claimed ownership of the marks and intended to assign the marks in the Asset Purchase Agreement." Although TMT–1's use and registration did not transfer ownership of the marks to TMT–1, the magistrate judge found that Hagedorn's silence towards TMT–2 regarding the trademarks was inequitable conduct that, under the doctrines of acquiescence and equitable estoppel, could cause TMT GmbH to lose its rights to the marks. The magistrate judge therefore ruled that TMT–2 had shown a likelihood of prevailing on the merits and that TMT–2 would face irreparable harm without an injunction. In addition, the magistrate judge found that based on the public's identification of the trademarks with TMT–2 rather than TMT GmbH, both the balance of

harms and the public interest weighed in favor of TMT-2.

## II. ANALYSIS

### A. Standard of Review

■■■ When considering a motion for a preliminary injunction, a district court must first determine whether the moving party has demonstrated 1) some likelihood of prevailing on the merits, and 2) an inadequate remedy at law and irreparable harm if preliminary relief is denied. If the movant demonstrates both, the court must then consider 3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied, and 4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties. *Grossbaum v. Indianapolis–Marion County Building Authority,* 100 F.3d 1287, 1291–92 (7th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997). Our review of a district court's decision to grant or deny a preliminary injunction is limited. Although a district court's legal conclusions are subject to *de novo* review, we review its findings of fact for clear error and its balancing of the preliminary injunction factors only for an abuse of discretion. *Id. at* 1292; *Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 314 (7th Cir. 1994).

### B. Applicable Law

As an initial matter, we should clarify what law provides the rule of decision for this case. Each party raised both federal statutory and state common-law claims in its pleadings, but the magistrate judge did not specify in her memorandum decision precisely which causes of action were the basis for the preliminary injunction. This lack of specificity is somewhat understandable "because federal and state laws regarding trademarks and related claims of unfair competition are substantially congruent." *International Order of Job's Daughters v. Lindeburg and Co.,* 633 F.2d 912, 916 (9th Cir.1980). The cases cited by the magistrate judge, however, are predominantly (if not exclusively) federal cases dealing with federal law, as are the vast majority of the cases cited by both parties. Moreover, neither party has suggested that state law presents any distinct considerations that would affect the outcome of this case. At least with respect to this preliminary injunction issue, therefore, we will treat this case as a federal Lanham Act case, analyzing the parties' contentions under the principles and case law of that statute. *See Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 n. 3 (11th Cir.1984); *Walt–West Enterprises, Inc. v. Gannett Co.,* 695 F.2d 1050, 1054 n. 4 (7th Cir.1982); *cf. W.T. Rogers Co. v. Keene,* 778 F.2d 334, 338 (7th Cir.1985).

### C. Merits

■■■ Section 43(a) of the Lanham Act creates a federal civil remedy against any person who uses in commerce "any word, term, name, symbol, or device" or "any false designation of origin" if it "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1). "Since the purpose of a trademark, whether federally registered or unregistered, is to designate the origin of goods, the infringement of such a trademark is actionable under section 43(a), provided the other requirements of the section are met." *W.T. Rogers Co.,* 778 F.2d at 337; *see also PHC, Inc. v. Pioneer Healthcare, Inc.,* 75 F.3d 75, 78 (1st Cir.1996); *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 502 (7th Cir.1992). Title 15 also authorizes federal courts "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable . . . to prevent the violation of any right" under § 34(a) of the Lanham Act. *See* 15 U.S.C. § 1116(a).

■■■ To determine whether an injunction is warranted to prevent either TMT–2 or TMT GmbH from violating § 43(a), we must first determine whether either party has used (or might in the future use) a "false designation of origin" regarding some product in commerce. For a party to show a *false* designation of origin, however, there

must be a *true* designation of origin. In a § 43(a) case, therefore, a preliminary question is always whether someone has used a word or symbol to identify goods such that the word or symbol refers (at least in the eyes of the law) only to that person's goods. *Cf. Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995) ("Trademark law aims to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source."). A first question, in other words, is whether any party has trademark rights in the words or symbols that are at issue.

■ This question is often framed as who "owns" a particular trademark. Strictly speaking, however, trademarks are not ordinary property interests. The anti-assignment-in-gross rule, for example, limits their transferability, prohibiting the assignment of trademark rights separate from the business with which the trademark has been associated. *See Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 676 (7th Cir.1982). A trademark is "an identifier rather than a property 'right,'" *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 380 (7th Cir.1996), and trademarks are thus protected only to the extent that they give consumers information about the origin or quality of products, *see Walt–West Enterprises, Inc.,* 695 F.2d at 1057.

■ Nonetheless, trademark rights are clearly analogous to property interests. A trademark gives a seller "a 'property right' in his mark of identification, appurtenant to his property rights in the goods he so marks, enabling the 'owner' of the trademark to enjoin [an] imposter from continuing misrepresentations." *Walt–West Enterprises, Inc.,* 695 F.2d at 1057. Without the ability to enjoin imposters, sellers would be helpless as other firms adopted similar marks to "induce customers to select their goods when the customers meant to select the goods of the firm that created the mark." *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1430 (7th Cir.1985). "If the law does not prevent it, free riding will eventually destroy the information capital embodied in a trademark,

and the prospect of free riding may therefore eliminate the incentive to develop a valuable trademark in the first place." William A. Landes & Richard A. Posner, *Trademark Law: An Economic Perspective,* 30 J.L. & Econ. 265, 270 (1987).

■ Consumers, in other words, benefit from trademarks, and sellers will develop trademarks only with the protection of the law. One of the ways that the law extends the benefits of trademarks and protects incentives to develop them is by allowing trademark owners to license the use of their marks to distributors and franchisees. Such licensing allows more information to be conveyed to more consumers without the licensor having to risk losing title to its mark. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:63 (4th ed.1997). Indeed, trademarks would be of much less value to society if only vertically-integrated firms could safely take advantage of trademark law's protections. Similarly, trademark law creates a presumption that, in the absence of an assignment of trademark rights, a foreign manufacturer retains all rights to a trademark even after licensing the use of the trademark to an exclusive U.S. distributor. *See Global Maschinen Gmbh v. Global Banking Systems, Inc.,* 227 U.S.P.Q. 862, 866, 1985 WL 71943 (T.T.A.B.1985); 4 McCarthy, *supra,* § 29:8. Such a distributor "does not acquire ownership of a foreign manufacturer's mark any-more than a wholesaler can acquire ownership of an American manufacturer's mark, merely through the sale and distribution of goods bearing the manufacturer's trademark." 4 McCarthy, supra, § 29:8; *cf. Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 435 (7th Cir.1989).

■ Turning finally to the facts of the present case, the magistrate judge found that TMT GmbH originally owned the trademarks and that the initial distribution agreement "implicitly licensed TMT–1 for the duration of the agreement to use the marks then owned by TMT GmbH." Moreover, the magistrate judge concluded that TMT–1's registration of the marks (and even the notice given to Hagedorn of the registration) did

not indicate transfer of ownership of the marks "in the context of the relationship between [TMT–1 and TMT GmbH] at the time." [2] Based on our review of the record and the applicable case law, we agree with these conclusions. The parties certainly did not expressly agree to transfer the marks, and the evidence is speculative even with regard to any implied transfer.[3] *See Automated Prods., Inc. v. FMB Maschinenbaugesellschaft mbH & Co.*, 34 U.S.P.Q.2d 1505, 1515 (N.D.Ill.1994) ("[T]here was no express transfer of any sort, and any argument of an implied transfer is crushed by the language of the exclusive agency agreement which reserves all rights to the foreign manufacturer."); *cf.* 1 Jerome Gilson, Trademark Protection and Practice § 3.02[13] (1997) ("In light of the strong initial presumption of manufacturer trademark ownership and the rather strict requirements for express transfers, a finding of transfer to a distributor by implication would be quite rare.").

The magistrate judge went on to find, however, that TMT GmbH's conduct towards *TMT–2* caused TMT GmbH to forfeit its rights to the marks. Although it was TMT–1 that made the representations of ownership

to TMT–2, the magistrate judge found that TMT GmbH (through Hagedorn) knew of TMT–1's representations yet did nothing to correct them in order to induce investment by TMT–2's investors. The magistrate judge did not make an explicit finding regarding whether Hagedorn himself represented that TMT–1 owned the marks, but the magistrate judge did state at a later hearing that TMT–2's witnesses were "almost, if not altogether, sure that Hagedorn himself had told investors that TMT–1 owned the marks." Moreover, the magistrate judge found that these investors "relied on Juergen Hagedorn's representations, or lack thereof, when they entered into the Asset Purchase Agreement." As an appellate court reviewing a cold record, we must accord deference to the magistrate judge's findings of fact. In this case particularly, the allegations and cross-allegations have a "he said, she said" quality that makes the magistrate judge's findings regarding witness credibility crucial to the resolution of this case. The magistrate judge clearly found TMT–2's version of events more credible than TMT GmbH's, and we will not second guess the magistrate judge on that credibility determination.

---

2. If anything, the magistrate judge's decision may actually have been too favorable towards TMT–1. The magistrate judge, for example, stated that one of the new investors in TMT–1 "testified that he was assured during one or more conversations, either by Juergen Hagedorn or in his presence, that TMT Services owned the trademarks." A closer look at this investor's testimony, however, reveals it to be somewhat more ambiguous:

Q.... What did [Hagedorn] say regarding trademark ownership that you recall?

A. No. 1, that I owned part of the trademark, okay. The—and-

Q. Those were the words he used?

A. Yes, yes. And because of that trademark, the ownership of that trademark, the company could then sell franchises using that trademark as the basis, as the crux, of that sale of the franchise, to keep everything consistent and to keep that name in front of people.

Q. Do you understand the distinction between ownership of a trademark and the right to distribute trademark products?

A. Probably not in a legal sense, no.

Q. So in that sense you don't—you don't know whether TMT Services owned the trademark or had the right to distribute the trademark product?

A. My impression was it was both, that you could not, in fact, distribute the franchises and

sell a franchise and develop the name without owning the product itself. There would be no reason to spend time doing that unless you owned the trademark itself because that's what you were selling.

Of course, it is both possible and logical that a distributor might have a license to use the trademark only during the distributorship. *See generally* 2 McCarthy § 18:63–64. It is also frequently the case that the licensee will attempt to "holdover" and retain the trademark even after the distributorship has ended. *See, e.g., Gorenstein*, 874 F.2d at 435; *Hank Thorp, Inc. v. Minilite, Inc.*, 474 F.Supp. 228, 238 (D.Del.1979).

3. The magistrate judge later held a hearing on a motion by TMT GmbH to reconsider her original decision. At that hearing, the magistrate judge appears to have changed her original conclusion, now stating that "ownership was transferred to TMT1 by implicit agreement to do so." We have had a hard time figuring out from the transcript what might have caused this apparent shift of position. Regardless, we find that any conclusion that ownership was transferred to TMT–1 by implied agreement cannot stand for the same reasons (stated below) that we reject the magistrate judge's original conclusion that ownership was impliedly transferred to TMT–2.

We disagree with the magistrate judge, however, regarding the legal implications of her factual findings. More specifically, we do not think the evidence can support a preliminary injunction against TMT GmbH. The magistrate judge ruled in favor of TMT–2 by applying an amalgam of trademark law doctrines. More specifically, the magistrate judge framed the issue as "whether Juergen Hagedorn's conduct caused TMT GmbH to lose its rights through acquiescence (implied agreement to transfer) or equitable estoppel." Now we are the first to admit that trademark law is often far from clear and that it "may create as much confusion in the courts as it eliminates in the marketplace." *Walt–West Enterprises, Inc.*, 695 F.2d at 1055. Indeed, trademark law's "hallmarks are doctrinal confusion, conflicting results, and judicial prolixity." *HMH Publishing Co. v. Brincat*, 504 F.2d 713, 716 (9th Cir.1974). Nonetheless, the magistrate judge seems to have conflated two reasonably distinct areas of trademark law in holding that TMT–2 was entitled to a preliminary injunction.

On the one hand, the magistrate judge reasoned that Hagedorn's conduct was tantamount to an implied agreement to transfer ownership of the marks to TMT–2. Such an implicit agreement would make TMT–2 the exclusive owner and allow TMT–2 to enjoin all other uses of the marks. We do not think, however, that the magistrate judge's own findings of fact are sufficient to support a conclusion that this case involved such a complete transfer of rights. Assignments of trademark rights do not have to be in writing, but an "implied agreement to transfer" requires conduct manifesting agreement, not just conduct that might be characterized as being shady or otherwise inequitable. *See* 2 McCarthy, *supra*, § 18:4. Indeed, one prominent trademark commentator suggests that without documentary evidence, an as-

signment "may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge." *Id.*; *see also Diebold, Inc. v. Multra–Guard, Inc.*, 189 U.S.P.Q. 119, 124, 1975 WL 20913 (T.T.A.B.1975); *Sun Valley Co. v. Sun Valley Mfg. Co.*, 167 U.S.P.Q. 304, 309, 1970 WL 9593 (T.T.A.B.1970). Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentives to identify expressly the ownership of the marks they employ. *Cf.* 15 U.S.C. § 1060 (requiring assignments of federal trademark registrations to be "by instruments in writing"); *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075–76 (5th Cir.1997) ("Because naked licensing is generally ultimately relevant only to establish an unintentional trademark abandonment which results in a loss of trademark rights against the world, the burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent."). In this case, however, both the documentary evidence and oral testimony are ambiguous and contradictory. Hagedorn disputed all of the TMT–2 investors' allegations, and TMT–2 made no mention of trademark ownership in the Memorandum of Agreement with TMT GmbH, which was signed roughly at the same time TMT–2 was negotiating with TMT–1. And after the Memorandum of Agreement, TMT–2's own drafts of a distribution agreement suggest that TMT GmbH still owned the trademarks. As we discuss below, the magistrate judge's findings regarding Hagedorn's conduct do not let TMT GmbH get off scot-free. The evidence on the record now, however, is simply insufficient to show that the parties agreed to a wholesale transfer of trademark rights.[4]

---

4. TMT–2 also cites cases such as *Ilapak Research & Dev. S.A. v. Record SpA*, 762 F.Supp. 1318 (N.D.Ill.1991), which hold that in a trademark dispute between manufacturer and distributor, a court should, in the absence of a written agreement, weigh numerous factors to decide which party owns the trademark. We think, however, that these factors are better applied to situations where the *initial* allocation of trademark rights is in dispute. See *generally* 2 McCarthy, *supra*, § 16:48. In *Ilapak*, for example, the parties had

no written contract from which to determine ownership. *See Ilapak*, 762 F.Supp. at 1322 n. 2. In this case, by contrast, the distribution agreement between TMT GmbH and TMT–1 explicitly provided that TMT–1 was "required to display the trademark and instructions *supplied* by TMT [GmbH]" (emphasis added). With TMT GmbH's initial ownership of the marks established by the agreement, TMT GmbH could lose its rights by assignment or by abandonment, but not by some nebulous balancing test.

On the other hand, the magistrate judge's decision was also based on equitable doctrines, most notably acquiescence. Specifically, acquiescence refers to "cases where the trademark owner, by affirmative word or deed, conveys its implied consent to another." 4 McCarthy, *supra*, § 31:41; *see also SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir.) (*SunAmerica II*), cert. denied, —— U.S. ——, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996). More generally, acquiescence is related to the doctrine of laches, by which "equity comes to the aid of an innocent user and grants him refuge from a claimant who has calmly folded his hands and remained silent while the innocent user has exploited and strengthened his mark." *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 881 (E.D.N.Y.1978). In this case, we agree with the magistrate judge that TMT–2 has shown a likelihood of success on the issue of TMT GmbH's acquiescence. Hagedorn's conduct towards TMT–2 during the negotiations with TMT–1, along with TMT GmbH's continued use of TMT–2 as a distributor even after TMT–2 disputed TMT GmbH's trademark ownership, could well rise to the level of acquiescence. TMT GmbH argues that acquiescence requires a longer delay than that which existed here, but although more protracted delay may be typical in acquiescence cases, we cannot say it is absolutely necessary for equitable relief.

But even assuming that TMT GmbH did acquiesce and that TMT–2 did innocently rely upon TMT GmbH's consent, acquiescence is at most a *defense* that TMT–2 may invoke against TMT GmbH. Trademark law is unmistakably clear that "[a] laches or acquiescence defense does not divest the trademark owner of the right to use the mark but may deprive him or her of any remedy for infringing uses by others." *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339, 1355–56 (E.D.N.Y.1994); *accord Exxon*, 109 F.3d at 1076 n. 7; *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1294 (9th Cir.1992); *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir.1984); *Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 765 (C.C.P.A.1982); 4 McCarthy, *supra*, § 31:43. Acquiescence, in other words, may estop TMT GmbH from enjoining TMT–2's use of the marks, but it does not enable TMT–2 to enjoin TMT GmbH's own uses.

A defense of abandonment, by contrast, does result in the loss of trademark rights against the world. *Sweetheart Plastics*, 743 F.2d at 1046, 4 McCarthy, *supra*, § 31:43. A trademark owner, for example, can abandon all trademark rights through uncontrolled or "naked" licensing. "If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977). TMT–2 has argued on appeal that naked licensing law supports its claims against TMT GmbH. TMT–2 cites, among other things, TMT GmbH's loss of control over product specifications as evidence that TMT GmbH has forfeited its rights to the trademarks.

Naked licensing law is full of contradictory strains, with some authorities requiring strict oversight by licensors and others taking a more lenient approach. *See generally* 2 McCarthy, *supra*, § 18:55. We tend towards the view taken by the Restatement (Third) of Unfair Competition, which advocates a flexible approach but allows licensors to rely at least somewhat on the reputation and expertise of licensees. *See* Restatement (Third) of Unfair Competition § 33 cmt. c (1995). In this case, TMT GmbH's control of the manufacture of the basic product (*i.e.*, the transfer paper), along with the absence of evidence indicating inadequate quality control by TMT–2, suggests that TMT–2 has not met the "heavy burden on [a] person asserting a lack of reasonable control by a licensor," *id.* TMT–2 nonetheless argues that American consumers now perceive TMT–2 as the provider of The Magic Touch products and that the trademarks therefore identify only TMT–2 as the entity responsible for the products. Such consumer identification with the licensee, however, will frequently be the case when trademarks are licensed. As dis-

cussed above, trademarks are useful to society because they convey information about product quality, and it is this information about the quality of products, not their sellers' reputations, that trademark law *primarily* protects. See 2 McCarthy, *supra,* § 18:40. Admittedly, licensing always entails some loss of control over product quality. If a licensor maintains reasonable control over product quality, however, consumers ultimately do rely upon the licensor's quality control. Absent a significant deviation from the licensor's quality standards, a licensor does not forfeit its trademark rights through licensing agreements. *See Kentucky Fried Chicken,* 549 F.2d at 387 ("That many consumers are undoubtedly oblivious to the corporate structure does not undermine the trademark system.").

■ If abandonment therefore does not work, TMT–2 has only an acquiescence defense against TMT GmbH, meaning that TMT–2 cannot enjoin TMT GmbH and that TMT GmbH cannot enjoin TMT–2. Acquiescence cases are thus "distinguishable from ordinary trademark infringement actions, in which complete injunctions against the infringing party are the order of the day." *SunAmerica II,* 77 F.3d at 1336; *see also Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.,* 934 F.2d 1551, 1563–65 (11th Cir.1991). The competing marks, in other words, stand in parity. *See SunAmerica II,* 77 F.3d at 1334. "After acquiescence, the senior user and junior user must treat one another's marks with equal dignity." *Id.* (quoting *SunAmerica v. Sun Life Assurance,* 974 F.2d 1348, 24 U.S.P.Q.2d 1505, 1511 (11th Cir.1992) (Birch, J., concurring) (*SunAmerica I*)).

■ Denying both parties injunctive relief, however, "is not a comfortable posture for the Court to assume" because it "is tantamount to holding that both parties are free to offer their products for sale in the same marketplace." *Johanna Farms,* 468 F.Supp. at 882; *see generally* 4 McCarthy, *supra,* § 31:10. The law therefore allows the senior user's claim to be revived from estoppel if the senior user can show that "inevitable confusion" would result from dual use of the marks. *SunAmerica II,* 77 F.3d at 1334;

*Coach House,* 934 F.2d at 1564; *see also Creative Computer Visions, Inc. v. Laser Learning Techs., Inc.,* 931 F.Supp. 455, 458 (S.D.W. Va.1996); *cf. Iodent Chem. Co. v. Dart Drug Corp.,* 207 U.S.P.Q. 602, 607, 1980 WL 30145 (T.T.A.B.1980). "Inevitable confusion" is "an increment higher than that required for a finding of likelihood of confusion." *SunAmerica II,* 77 F.3d at 1334 n. 3 (quoting *Coach House,* 934 F.2d at 1564). Moreover, when structuring a remedy, "the legitimate coexisting interests of the parties in an acquiescence case counsels for minimizing the hardship on either party to the extent possible consistent with the public interest." *SunAmerica II,* 77 F.3d at 1336. In other words, "the hardship of a total injunction against a junior user ... is permissible only if the junior user fails to demonstrate the availability of a feasible and effective alternative means of redressing the senior user's revived claim and vindicating the public interest in eliminating marketplace confusion, without causing undue hardship to the senior user." *Id.*

■ So when this case goes back to the District Court, no future preliminary injunction based on acquiescence should issue unless TMT GmbH (as the senior user) demonstrates that inevitable confusion would result from dual use of the marks. Factual findings regarding likelihood of confusion are, of course, subject only to clear error review, *see Scandia Down,* 772 F.2d at 1428, and any remedy designed by the District Court will be within that court's equitable discretion, *see SunAmerica II,* 77 F.3d at 1337. We do, however, have some suggestions that the District Court may (or may not) want to consider. It is at least possible, for example, that inevitable confusion will not materialize prior to final judgment in this case because TMT GmbH may in the interim be unable to establish a new distribution system in the United States. Even if TMT GmbH does attain access to American markets, it is also quite possible that some alternative to a total injunction will avoid inevitable confusion. In *SunAmerica II,* for example, numerous alternatives were considered, including adding modifiers to the trademark and conducting educational campaigns to differentiate the

parties and their marks. *See id. at* 1338; *see also Wrist–Rocket Mfg. Co. v. Saunders Archery Co.,* 516 F.2d 846, 853 (8th Cir.1975). Finally, TMT–2's use of the marks in connection with certain accessory products (such as heat presses) may have been so uncontrolled that TMT GmbH may have abandoned the marks at least with respect to those products. *See* Restatement (Third) of Unfair Competition § 33 cmt. b (1995). These, of course, are only suggestions for the District Court's consideration, and we express no further opinion on their merits or on the ultimate outcome of this litigation.

The District Court's preliminary injunction is Vacated, and this case is Remanded for further proceedings consistent with this opinion.