COMMERCE NATIONAL INSURANCE SERVICES, INC. and Commerce Bancorp, Inc., Plaintiffs,

v.

COMMERCE INSURANCE AGENCY, INC. and Commerce Insurance Agency of South Jersey, Inc., Defendants.

COMMERCE INSURANCE AGENCY, INC., Plaintiff,

v.

COMMERCE NATIONAL INSURANCE SERVICES, INC., Defendant.

No. CIV. A. 97–4600 (JEI), CIV. A. 97–4750 (JEI).

United States District Court, D. New Jersey.

Feb. 18, 1998.

Blank, Rome, Comisky & McCauley, LLP, by Laurence Shtasel, Mark N. Epstein, Cherry Hill, NJ, for Commerce Nat'l Ins. Servs., Inc. and Commerce Bancorp., Inc.

Ward & Olivo, by John F. Ward, John W. Olivo, Jr., New York, NY, for Commerce Ins. Agency, Inc.

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, by John G. Gilfillan, III, Kenneth L. Winters, Roseland, NJ, for Commerce Ins. Agency, Inc.

## OPINION

IRENAS, District Judge.

This matter comes before this Court on Commerce National Insurance Services, Inc.,

("CNIS") and Commerce Bancorp, Inc.'s ("CBI") application for preliminary injunctive relief against Commerce Insurance Agency, Inc. ("CIA"), and CIA's application for preliminary injunctive relief against CNIS. These applications arise out of a service mark dispute between the parties.[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

For the reasons that follow, this Court will: (1) deny both parties' applications for preliminary injunctions prohibiting each other's use of the mark "Commerce;" (2) grant CNIS and CBI's application for a preliminary injunction prohibiting CIA from using a stylized, indented capital "C" in physical proximity to the mark "Commerce," or any similar logo;[2] (3) grant CNIS and CBI's application for a preliminary injunction prohibiting CIA from using the term "National" in identifying itself or its services; and (4) grant CIA's application for a preliminary injunction prohibiting CNIS from using the abbreviated name "Commerce Insurance."

## I. BACKGROUND

CBI was founded in 1973 with a branch in Marlton, New Jersey. Today it is a large bank, with more than fifty branches and nearly $3 billion in deposits. Since approximately January, 1973, CBI has used as a logo ("the CBI logo") a curved, filled-in, block-lettered, slightly italicized large-type "C" appearing, indented, below "Commerce." (*See infra* at A–1).[3] CBI has promoted the "Commerce" mark and the CBI logo widely through customer services, promotional materials, advertisements and community service activities. Since December of 1974, CBI has offered credit life insurance and credit disability insurance in connection with its banking services.[4]

CIA was founded in April, 1983, with a single office in Cedar Brook, New Jersey. After five years of growth and expansion, CIA moved to larger offices in Sicklersville. CIA serves insurance customers in New Jersey and "elsewhere." Since 1985, CIA has used as a logo ("the CIA logo") a block-lettered, slightly italicized large-type "C" appearing, indented, below "Commerce." (*See infra* at A–1). Recently, CIA has begun using "Commerce National Insurance Agency" as its business name and service mark. (Aff. of Norcross ¶ 14 & Exh. A).

In 1986, CIA began banking at CBI. CIA secured lines of credit from CBI and rented a safe deposit box. In October, 1988, CBI invited CIA to contribute to CBI's 5th Annual Commerce Golf Classic and CIA made a contribution. (Aff. of Loser ¶¶ 7–8 & Exh. 4 at 5). CBI listed CIA as a sponsor in the Golf Classic's printed program and placed CIA's name on a sign at the event. (*Id.* ¶ 8 & Exh. 4 at p. 5). CIA and CBI have referred individuals and businesses to each other. (*Id.* ¶ 9). From 1983 to 1996, CIA never was made aware of anyone who believed CIA was a part of CBI or vice versa, and CIA and CBI co-existed without any confusion between CIA's insurance services and CBI's banking operations. (*Id.* ¶ 10).

On July 25, 1996, CBI announced its intention to form Commerce National Insurance Services, Inc. ("CNIS"), now a subsidiary of CBI. The announcement came in the wake of *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996), in which the Supreme Court found that a federal statute permitting a national bank to sell insurance, 12 U.S.C. § 92, preempts any inconsistent state law. Having purchased several additional insur-

---

1. Service marks are used to identify the source of services and are entitled to the same legal protection as trademarks; the terms may be used interchangeably with no significant legal consequences. *Dranoff–Perlstein Assocs. v. Sklar*, 967 F.2d 852, 855 (3d Cir.1992). Similarly, "[p]rotection against the confusing use of commercial and corporate [business] names is afforded upon the same basic principles as apply to trademarks in general." 1 J. Thomas McCarthy *McCarthy on Trademarks and Unfair Competition* § 9:1 (4th ed.1997). This opinion will use the terms "trademark," "service mark," "business name" and "mark" essentially interchangeably.

2. Reproductions of the parties' respective logos appear at the conclusion of this opinion. *See infra* at A–1.

3. In color publications and signs, the "C" is colored red.

4. Credit insurance involves contracts whereby the insurer promises to pay an amount sufficient at least to discharge the debt of the insured in the event of her death or, in the event of her disability, at least sufficient to meet the insured's installment payments during the period of disability. *Black's Law Dictionary* 367–68 (6th ed.1990).

ance agencies, CNIS now provides insurance services to more than 38,000 customers maintaining more than $150 million of insurance coverage. CNIS has been using versions of the CBI logo which feature "Commerce National Insurance Services," or "Commerce Insurance," in place of "Commerce Bank."

In August, 1996, CIA began taking actions apparently designed to shore up its position for a potential trademark dispute with CNIS/CBI. On August 26, 1996, CIA filed a service mark registration application with the United States Patent and Trademark Office for federal registration of its interstate use of "Commerce" for insurance products. The application was granted. On August 28, 1996, CIA filed a service mark registration application with the New Jersey Secretary of State ("the Secretary") for state registration of the mark "Commerce Insurance Agency." This mark was registered by the Secretary on September 3, 1996. On September 3, 1996, CIA filed a service mark registration application with the Secretary for registration of the mark "Commerce National Insurance Agency." This mark was registered by the Secretary on September 11, 1996.

The presence of two similarly-named insurance companies operating in southern New Jersey has caused some confusion. In early 1997, CIA contacted an insurance carrier to track down a missing policy and was asked by the carrier what CIA's agency code number had been prior to CBI's purchase of CIA. In May, 1997, the parties began to receive each other's mail. (Aff. of Loser ¶ 18). CIA brought this situation to CNIS's attention in June, 1997, and again in August and September of 1997. (Id. ¶ 19). In June, 1997, CNIS denied the existence of client confusion. (Id. ¶ 19). CNIS currently is using "Commerce," "Commerce Insurance," "Commerce National," and "Commerce National Insurance" in connection with its operations. CIA continues to receive mail and telephone calls intended for CNIS. (Id. ¶ 19).

CNIS and CBI [hereinafter, when referred to in their capacity as litigants, "CNIS/CBI"] filed a complaint on September 12, 1997. CIA filed its own complaint on September 29, 1997. CNIS/CBI states that, since its complaint was filed, it has learned that—as recently as October, 1997—CIA has been promoting CNIS's mark, including a stylized capital "C," in a manner virtually identical to CNIS's use of that mark. (Aff. of Norcross ¶ 14).[5] The parties' actions have been consolidated. CNIS/CBI and CIA filed their motions for preliminary injunctive relief on October 29, 1997, and November 12, 1997, respectively.

## II. PRELIMINARY INJUNCTION STANDARD

■ In order to obtain a preliminary injunction, the moving party must show: (1) a reasonable probability of eventual success in the litigation; and (2) that it will be harmed irreparably *pendente lite* if relief is not granted. *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994). Where appropriate, the court also must: (3) balance the hardships to the respective parties; and (4) determine whether the issuance of a preliminary injunction will further the public interest. *Optician's Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 197 (3d Cir.1990); *see Acierno,* 40 F.3d at 653. All factors should favor preliminary relief before an injunction will issue. *S & R Corp. v. Jiffy Lube Int'l Inc.,* 968 F.2d 371, 374 (3d Cir.1992).

## III. DISCUSSION

### A. *The Underlying Claims*

CNIS/CBI states claims against CIA for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (2) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1); (3) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (4) common law unfair competition; and (5) appropriation of trademark in violation of N.J.S.A. § 56:4–1. CIA asserts claims against CNIS for: (1) service mark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (2) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); (3) service mark in-

---

5. These financial services include financial planning, retirement savings plans and long-term investments. (Aff. of Norcross ¶ 14).

fringement in violation of N.J.S.A., Title 56; (4) common law unfair competition; and (5) tortious interference with prospective economic advantage. Both parties base their preliminary injunction applications solely on the federal trademark infringement issue. They characterize the alleged irreparable harm as consumer confusion leading to deprivation of good will and damage to reputation.

### B. The Parties' Applications for Preliminary Relief

CNIS/CBI seeks to enjoin CIA:

1. From using the name "Commerce National Insurance Agency;"

2. From using: (a) the mark "Commerce;" (b) the CIA logo; and/or (c) "Commerce National Insurance Services," or a mark which uses "Commerce" as a component, or anything confusingly similar, in connection with the sale of insurance;

3. From suggesting in any way that CIA's products and services are associated with, sponsored by, or connected/affiliated with CNIS/CBI.

CIA seeks to enjoin CNIS:

1. From using the name "Commerce National Insurance Services, Inc.;"

2. From using: (a) the mark "Commerce;" and/or (b) the mark "Commerce National Insurance Services," or a mark which employs "Commerce" as a component or anything confusingly similar, in connection with the sale of insurance; and,

3. From suggesting in any way that CNIS's products and services are associated with, sponsored by, or otherwise connected/affiliated with CIA.

### C. The Legal Standards

#### 1. Standard for Trademark Infringement Claim

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983). "Generally, to win a trademark claim, a

plaintiff must establish that (1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Opticians Ass'n of America*, 920 F.2d at 192; *see Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir.1994); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir.), *cert. denied sub. nom, Altran Corp. v. Ford Motor Co.*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991).

> The first two requirements, validity and legal protectability, are proven where ... a mark was federally registered and has become "incontestible" under the Lanham Act, 15 U.S.C. §§ 1058 and 1065. *Ford Motor Co.*, 930 F.2d at 291 (citing *Opticians Ass'n*, 920 F.2d at 194). If the mark has not been federally registered or, if registered, has not achieved incontestability, validity depends on proof of secondary meaning, unless the unregistered mark is inherently distinctive. *Ford Motor Co.*, 930 F.2d at 291 (citing *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986)).

*Fisons Horticulture, Inc.*, 30 F.3d at 472 (footnote omitted).[6]

"The prime element of secondary meaning is a *mental association* in buyers' minds between the alleged mark and a single source of the product." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:5 (4th ed.1997). "Secondary meaning is demonstrated where, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself." *Ford Motor Co.*, 930 F.2d at 292 (internal quotes omitted). While there is no consensus on the elements of secondary meaning,

> [a] non-exclusive list of factors which may be considered includes the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the

---

**6.** "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture, Inc.*, 30 F.3d at 472 n. 7.

fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion.

*Id.*

Ownership of a mark is established by being the first to adopt and use the mark. *Id.; see ACCU Personnel, Inc. v. AccuStaff, Inc.*, 846 F.Supp. 1191, 1213 (D.Del.1994) ("[T]he senior user usually is deemed the owner of the trademark."); 2 *McCarthy* § 19:3. "[T]he first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce." *Ford Motor Co.*, 930 F.2d at 292.

"A plaintiff must also prove the third requirement, the likelihood of confusion, which exists when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Fisons Horticulture, Inc.*, 30 F.3d at 472–73 (internal quotes omitted). Where the parties are selling competitive goods or services, the court rarely need look beyond the mark itself in making the likelihood of confusion determination. *Interpace Corp.*, 721 F.2d at 462.

Where goods and services are non-competitive, there may be a likelihood of confusion sufficient to permit a trademark plaintiff to prevail. 3 *McCarthy* § 24:13. "The modern rule of law gives the trademark owner protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.* § 24:6. The question is whether the goods or services are so related that a reasonable buyer is likely to believe that the alleged infringer's goods or services are somehow connected with the plaintiff due to the use of similar marks. *Id.* § 24:24. It is not a question of some inherent quality of the goods, but whether buyers are likely to believe the defendant's goods come from, or are sponsored by, the senior user. *Id.*

"[T]wo issues must be resolved: (1) Are the marks themselves confusingly similar? and (2) Are the goods of the respective parties so 'related' that an ordinary prudent purchaser will be likely to be confused as to source, connection or sponsorship? ... [T]hese two issues ... [may be] dealt with in one fell swoop under the ultimate 'likelihood of confusion' test." *Id.* § 24:27. The factors to be used "to aid in determining likelihood of confusion in non-competing products cases" (hereinafter, "the *Scott Paper* factors") are as follows:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Interpace Corp.*, 721 F.2d at 462–63 (citing *Scott Paper Co. v. Scott's Liquid Gold*, 589 F.2d 1225, 1229 (3d Cir.1978)); *see Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.*, 963 F.2d 628, 637 (3d Cir.1992); *Ford Motor Co.*, 930 F.2d at 293.

2. *Standard for Showing Irreparable Harm*

In a trademark infringement case, "[g]rounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Opticians Ass'n of America*, 920 F.2d at 195. Where the plaintiff makes a strong showing of likely confusion, irreparable injury usually follows as a matter of course. *Id.* at 196. In addition, "[p]otential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trade-

mark case." *Id.* at 196; *see Acierno,* 40 F.3d at 654 n. 11; *see also* 4 *McCarthy* § 30:47 ("loss of control of reputation" as irreparable harm).

### 3. *Standard for Balancing the Hardships*

██ "In deciding whether injunctive relief is appropriate, the third task a trial court must undertake is to balance the hardships to the respective parties. . . . A basic purpose behind the balancing analysis [in a trademark infringement case] is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner." *Opticians Ass'n of America,* 920 F.2d at 197.

### 4. *Standard for Determining the Public Interest*

██ "Public interest can be .defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Id.* at 197. Where consumer confusion has been shown to be a likely result if concurrent use of a mark continues, it follows that the public interest will be damaged by continuing concurrent use. *Id.* at 198.

### D. *Preliminary Considerations and Conclusions*

### 1. *Strength of CNIS/CBI's Marks*

The strength of a mark is of central importance in any infringement case. The two marks at issue are the "Commerce" mark and the CBI logo. This Court will discuss the strength of each of these marks.

██ Marks are accorded varying degrees of protection according to their strength. One measure of a mark's strength is conceptual. This measure involves the mark's placement on the spectrum of marks. The spectrum categorizes marks in terms of their distinctiveness. At its stronger end are marks requiring no proof of secondary meaning in order to be considered distinctive. These marks—arbitrary marks, fanciful marks and suggestive marks—are said to be inherently distinctive.

Arbitrary marks are "those words, symbols, pictures, etc., which are in common linguistic use but which when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." 1 McCarthy, *Trademarks and Unfair Competition* at § 11:4. Fanciful marks "consist of 'coined' words which have been invented for the sole purpose of functioning as a trademark." *Id.* at § 11:3. Marks such as "letters, numbers, product and container shapes, and designs and pictures may also be classified as 'fanciful.' " *Id.* Suggestive marks .are virtually indistinguishable from arbitrary marks, *id.* at § 11:4, but have been defined as marks which suggest a quality or ingredient of goods. *Id.* at § 11:20. *Ford Motor Co.,* 930 F.2d at 292 n. 18. At the weaker end of the spectrum are "descriptive" marks. "A mark is considered descriptive if it describes 'the intended purpose[], function, or use of the goods; . . . the size of the goods, . . . the class of users of the goods, . . . a desirable characteristic of the goods, . . . [or] the end effect upon the user.' " *Id.* (quoting 1 *McCarthy* § 11:5). Descriptive marks are said not to be inherently distinctive.

██ The most difficult line to draw is the one between suggestive marks and descriptive marks. A popular test utilized is the imagination test: the more consumer imagination required to get a direct description of the product from the term, the more likely it is that the term is suggestive. *Id.* § 11:67. Another principle is that if the term is frequently used to describe the same or similar products or services, then an inference that the term is descriptive arises. *Dranoff–Perlstein Assocs. v. Sklar,* 967 F.2d 852, 858 (3d Cir.1992) (citing *Security Ctr., Ltd. v. First Nat'l Sec. Ctrs.,* 750 F.2d 1295, 1300 (5th Cir.1985)); 1 *McCarthy* § 11:69.

A mark's strength is always relative. Its true relative strength cannot be determined simply by assessing its conceptual strength. A mark's commercial strength—its marketplace recognition value—also must be considered. *See Versa Products Co. v. Bifold Co.,* 50 F.3d 189, 203 (3d Cir.), *cert. denied,* 516 U.S. 808, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995); 1 *McCarthy* § 11:83. Thus, for example, "if many others in other product markets are using this term, the mark may be labeled

'weak' and entitled only to narrow protection," 1 *McCarthy* § 11:71; *see id.* § 11:88, as it is reasonable to infer that consumers "have been conditioned to expect different sources for specifically different goods or services" bearing a frequently used mark "even though such goods or services might be deemed sufficiently related to be attributable to a single source under an uncommonly used mark," *National Cable Television Ass'n v. American Cinema Editors, Inc.*, 937 F.2d 1572, 1579 (Fed.Cir.1991).

◼ Neither the "suggestive" nor the "descriptive" label quite fits the "Commerce" mark. However, since "Commerce" is a term used frequently to designate a variety of businesses, services and products, what conceptual distinctiveness it does have is diluted. Thus, although not fairly characterized as descriptive, the "Commerce" mark is not inherently distinctive and does not have great conceptual strength. The mark does have substantial marketplace recognition value in New Jersey. Consumers viewing the term "Commerce" in front of a bank, in connection with banking more generally, or in a headline or article in a newspaper business section may well assume they are dealing with CBI. Still, given the frequency with which consumers see the term "Commerce"—and similar marks such as "Commercial"—they likely have come to recognize that different goods and services identified by the term "Commerce" may have different origins. On balance, this Court concludes that the "Commerce" mark, by virtue of its marketplace recognition, was fairly strong in 1983—when CIA was founded—and is stronger today. It will be protected in connection with banking and financial services. It also will be protected in connection with some products and services which are closely related to banking and financial services in the minds of consumers.

◼ The CBI logo, by contrast, is very strong in New Jersey. While letter logos are used widely, CBI's "C" is distinctive because it is highly stylized and colored bright red. Proof of secondary meaning in the banking industry is very strong. The CBI logo, in proximity to "Commerce," has been used and promoted consistently for approximately twenty-five years. CBI has more than fifty branches statewide displaying the CBI logo on large outdoor signs. The CBI logo thus possesses an appreciable degree of conceptual strength and a great degree of commercial strength. Its zone of protection will be broad.

### 2. *Competitive and Non–Competitive Products/Services*

At the outset of the analysis this Court notes that the record supports two conclusions: (1) from 1983 until August, 1996, CBI and CIA did not offer competitive insurance products or services to the public; and (2) CBI and CIA currently are offering competitive insurance products and services to the public.

The discussion now turns to consideration of the parties' specific requests for preliminary injunctive relief.

### E. *CNIS/CBI's Application for a Preliminary Injunction Prohibiting CIA from Using the "Commerce" Mark*

CNIS/CBI requests that this Court enjoin CIA from using the "Commerce" mark. Consideration of this application requires this Court to determine, first, whether CBI has ownership rights in the "Commerce" mark, and, second, whether CBI today is barred from invoking such rights to prevent CIA from using the mark.

### 1. *CBI's Rights in the "Commerce" Mark*

◼ In this case a senior user (CBI) has expanded its use of a mark into a product or service area (insurance) and has created thereby a conflict with an "intervening junior user" (CIA) who already has been using the mark in that area. Resolution of the instant issue, therefore, requires this Court to consider the perception of customers at the time CIA began using the "Commerce" mark in 1983. 3 *McCarthy* § 24:20. This Court must determine whether there was a likelihood of confusion in 1983, for if CIA's use of the "Commerce" mark in 1983 was likely to cause confusion, then CBI would have had the right to enjoin CIA's use of the "Commerce" mark. This determination is made by conducting a (retroactive) weighing of the *Scott Paper* factors.

**(1) *Degree of Similarity Between the Marks***

This factor is of "primary" importance in the likelihood of confusion analysis. *Versa Products Co.*, 50 F.3d at 202. Here it obviously weighs in favor of CNIS/CBI since both parties were using "Commerce" in 1983.

**(2) *Strength of the Commerce Mark***

As discussed above, the "Commerce" mark was fairly strong in 1983 when CIA was founded. The mark was entitled at that time to relatively broad protection in southern New Jersey. Therefore, this factor favors CNIS/CBI's position.

**(3) *Price of the Goods and Other Factors Indicative of the Care and Attention Expected of Consumers When Making a Purchase***

Insurance is relatively costly, and purchasers of policies are sensitive to price differences. Trust often plays a key role in consumers' choice of insurance agents. Consumers handle their insurance purchase decisions with care. However, steps preliminary to an actual purchase of insurance may be marked by impersonal dealings. Some companies sell insurance policies over the telephone. Generally in the insurance industry, at least some proportion of preliminary dealing is conducted over the telephone, even if the consumer ultimately must meet with an agent to purchase the policy. Consumers, then, are expected to exercise care and attention when shopping for insurance. But it is not clear that consumers ever direct this care and attention towards ascertaining the precise affiliations of the party selling them their policies. On balance, this Court concludes that the third *Scott Paper* factor weighs in favor of neither party's position.

**(4) *Length of Time CIA Has Used Mark Without Evidence of Actual Confusion***

This factor perhaps favors CIA slightly because there is no evidence of actual confusion between 1983 and the Fall of 1996, when CBI entered the insurance business. This factor must not be given much weight, though, as neither party has investigated whether there was such confusion.

**(5) *Intent of CIA in Adopting the Mark***

This factor considers whether CIA's intent in adopting the "Commerce" mark was to confuse or deceive customers. *Versa Prods. Co.*, 50 F.3d at 205. There is no evidence— only accusations—that CIA adopted the "Commerce" mark other than in good faith. This *Scott Paper* factor weighs in CIA's favor.

**(6) *Evidence of Actual Confusion***

This Court will not speculate as to whether or not there was actual confusion in 1983. Neither party has investigated this question. This factor weighs in neither party's favor.

**(7) *Whether the Goods, Though Not Competing, Are Marketed Through the Same Channels of Trade and Advertised Through the Same Media***

Lacking evidence, this Court presumes this factor favors CNIS/CBI, as common sense tends to suggest that in 1983 insurance, financial planning and general banking services were marketed and advertised through similar channels.

**(8) *The Extent to Which the Targets of the Parties' Sales Efforts Are the Same***

The analysis of factor (7) above controls this factor as well.

**(9) *Relationship of Services in Minds of Consumers Because of Similarity of Function***

This factor weighs slightly in CBI's favor. Although the record on this point is not well developed, it probably is correct to say that consumers might expect a bank to be involved in related financial enterprises such as insurance, but this observation belongs in a discussion of the next and final *Scott Paper* factor.

**(10) *Other Facts Suggesting That Consuming Public Might Have Expected CBI to Offer Services in CIA's Market, or That CBI was Likely to Expand into That Market.***

This factor is probably the most important one in this case. The analysis focuses on

"the ordinary customer's perception of possible expansion." 3 *McCarthy* § 24:19. In addition, "the law must take into account that [the reasonably prudent] buyer knows that modern corporations have control over widely diversified products." *Id.* § 24:54

It is true that in 1983, when CIA was founded, CBI by law could not have sold insurance, but the instant inquiry concerns consumer psychology, not consumers' knowledge of the law. The lines between banking and finance, insurance, annuities, investing, financial planning, etc., probably never have been certain ones in the minds of consumers. The composite phrase "Banking and Insurance" probably has resonance in the consumer mind. Consumers long have been aware that banks seek to expand territorially and in terms of the products and services they offer. These considerations taken together support the conclusion that, in 1983, many reasonable consumers encountering "Commerce" in connection with insurance and financial planning would have assumed they were dealing with CBI or some CBI affiliate or offshoot.

Other factors demonstrate the close relationship of banking and insurance in the public mind. For example, at various times, including today, New Jersey has had a Department of Banking and Insurance. In addition, New Jersey is very close to New York, and it is well-known that New York banks sell life insurance. Moreover, it is beyond question that insurance—especially life insurance—is an important factor in any estate or financial planning venture. The result has been that banks and insurance companies always have been competitors insofar as they both have been offering estate and financial planning services.[78]

(11) *Likelihood of Confusion: Conclusion*

The balance of the *Scott Paper* factors tips in CNIS/CBI's favor. CIA's use of the "Commerce" mark in 1983 was likely to create confusion. Therefore, the zone of protection for CBI's mark in 1983 encompassed the financial planning and insurance areas. Thus, CBI's rights in the mark in these areas are senior to CIA's, and CIA's use of the "Commerce" mark was an infringing use in 1983.

2. *Laches*

The problem CNIS/CBI faces now is that it did not file suit until 1997, and CIA contends that CNIS/CBI should be barred by laches from receiving the preliminary relief it seeks because "[d]uring approximately twelve years of knowing co-existence, [CBI] never once complained to [CIA] about its name." (CIA's Brief in Opposition to CNIS/CBI's Motion for Preliminary Injunction and In Support of CIA's Motion for Preliminary Injunction at 13).

Laches "is the obvious rebuttal to a tardy assertion of rights" in situations involving intervening junior users such as CIA. 3 *McCarthy* § 24:20. "[L]aches consists of two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay." *University of Pittsburgh v. Champion Prods. Inc.,* 686 F.2d 1040, 1044 (3d Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *see Central Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098, 1108 (3d Cir.1996). Laches works an equitable estoppel barring relief. *University of Pittsburgh,* 686 F.2d at 1044.

"The defense of laches is recognized as a valid defense to an action for trademark infringement." *Tonka Corp. v. Rose Art Indus., Inc.,* 836 F.Supp. 200, 219 (D.N.J.1993) (citing cases). "[I]f proven, laches generally will bar a claim for an accounting of past infringement but not a claim for prospective injunctive relief." *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114, 1140 (D.N.J.1993) (citing *University of Pittsburgh,* 686 F.2d at

7. For support for the proposition that the life insurance industry long has been in direct competition with savings institutions, see Joseph E. Irenas, *Life Insurance Interest Income Under the Federal Income Tax* 21 Tax L.Rev. 297, 307 n. 43 (1966).

8. It is probably fair to say that neither banks nor insurance agencies look at financial planning services as a primary profit center. Rather, focus on estate or financial planning permits the sale of their primary products: in the case of banks, deposit accounts and trust department services; in the case of insurance agencies, primarily life insurance policies. CIA has been selling life insurance since its founding in 1983. (Feb. 16, 1998, Aff. of Loser ¶ 3).

1044). This general principle notwithstanding, laches will bar injunctive relief in appropriate cases. *See, e.g., Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500, 508 (9th Cir.1991); *Guardian Life Ins. Co. of America v. American Guardian Life Assur. Co.,* 943 F.Supp. 509, 518 (E.D.Pa.1996).

▮ Moreover, although it "usually requires the kind of record only created by full trial on the merits," *Country Floors v. A Partnership of Gepner and Ford,* 930 F.2d 1056, 1066 (3d Cir.1991), a laches defense may be used to prevent a preliminary injunction from issuing, *see generally* 4 *McCarthy* § 31:31. Indeed, one leading commentator notes that "a lesser quantum of laches will suffice as a defense to a preliminary injunction than for a final injunction." *Id.; see My–T Fine Corp. v. Samuels,* 69 F.2d 76, 78 (2d Cir.1934) (L.Hand, J.) ("No doubt less is necessary to defeat a preliminary injunction; delay alone may be enough, at least if the original use was innocent.").

▮ "Before any 'delay' of plaintiff in suing can be said to constitute laches, it is clear that plaintiff must have been actually or constructively on notice of defendant's activities." 4 *McCarthy* § 31:38. CNIS/CBI argues that knowledge on the part of CBI employees with whom CIA had contact cannot be imputed to the corporation. It is not clear whether CNIS/CBI is denying having known about CIA's use of "Commerce" prior to 1997. Assuming that CNIS/CBI is denying such knowledge, this Court nevertheless is persuaded that knowledge of the alleged infringement should be imputed to CBI.

On one view, "[a] corporation is not charged with notice [of an infringing use] if business dealings with defendant were conducted by lower echelon employees who had no duty to report instances of trademark infringement." *Id.* § 31:39; *accord Official Airline Guides, Inc. v. Churchfield Publications, Inc.,* 756 F.Supp. 1393, 1404 (D.Or.

1990), *aff'd,* 6 F.3d 1385 (9th Cir.1993). "In order to impute an agent's knowledge to a principal, it must be shown that the agent had duties with respect to trademark matters ...." 4 *McCarthy* § 31:39. Other authorities suggest that knowledge will be imputed where the agents sell and promote the principal's products or services. *See Georgia Pacific Corp. v. Great Plains Bag Co.,* 614 F.2d 757, 762 (C.C.P.A.1980) (citing *Dawn Donut v. Hart's Food Stores,* 267 F.2d 358, 363 (2d Cir.1959)).

CIA began banking with CBI in 1986. It obtained lines of credit from CBI and entered into a contract with CBI to rent a safe deposit box. Communications from CBI to CIA were signed by a regional vice-president, the Chairman and President [9] and a CBI branch manager. CIA co-sponsored a CBI charity event; in turn, CBI held CIA out to the public by name as an event sponsor. CIA apparently had a good working relationship with CBI managerial personnel. The parties referred customers to each other. Actual knowledge of CIA's use of the "Commerce" mark properly is imputed to the corporation here.[10]

Moreover, CBI can be said to have had constructive knowledge of CIA's use of "Commerce." CIA used the mark openly and notoriously. CIA dealt frequently with CBI. CBI had a duty to police the marketplace for infringing uses of its mark, especially in view of the fact that the mark's strength comes precisely from marketplace recognition and not from any inherent distinctiveness. Thus, the facts and circumstances of this case compel the conclusion that CBI could have known about CIA's use of "Commerce" and should have known about that use. CBI therefore is charged with constructive knowledge. *See Johnston v. Standard Mining Co.,* 148 U.S. 360, 370, 13 S.Ct. 585, 37 L.Ed. 480 (1893) ("[P]laintiff is chargeable with such knowledge as he might

---

**9.** This communication was a "Dear Depositor" letter.

**10.** While CNIS/CBI suggests that much of CBI's correspondence with CIA was computer-generated mail of the "Dear Depositor" type, CNIS/CBI fails to note the double-edged nature of this sword. Surely at least some of this correspondence was generated by CBI's marketing/pro-

motional personnel. If employees entrusted with the marketing and promotion of CBI's name and services do not have a duty to be on the lookout for, and to report, possible infringement, it is hard to imagine who does. That letters produced by these employees are generated by computers is no excuse for CBI's lack of vigilance in protecting its mark.

have obtained upon inquiry provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."); *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161 (5th Cir.1982) (adopting "knew or should have known" standard as "a logical implementation of the duty to police one's mark"); *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir.1964) ("[A] plaintiff may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered."); *see generally* 4 *McCarthy* § 31:38.

▮ In sum, CBI's fourteen-year delay in protesting CIA's use of the "Commerce" mark is inexcusable.[11] Laches requires next a showing of prejudice to CIA from CBI's inexcusable delay. CIA's apparent position is that while CBI sat on its hands, CIA in good faith reliance on CBI's silence built up a business which at all times has used the "Commerce" mark.

"Laches is a good defense if plaintiff's long failure to exercise its legal rights has caused defendant to rely to its detriment by building up a valuable business around its trademark." 4 *McCarthy* § 31:12 (citing cases). Laches becomes relevant precisely "where the senior [user of the mark] delays in asserting its rights for so long that the junior [user] has developed sufficient demand and goodwill through its own efforts that it would be inequitable to enforce the senior's rights." *University of Pittsburgh*, 686 F.2d at 1047; *see Tonka Corp.*, 836 F.Supp. at 219.

CIA has been lulled by CBI into a sense of security regarding its use of the "Commerce" mark. Since 1986, CIA has had good reason to believe CBI knew of, and did not object to, CIA's use of the "Commerce" mark. For the more than fourteen years CIA has existed it has operated under that mark. Promoting itself and its services with the "Commerce" mark, CIA has built up demand and good will sufficient to sustain and grow its business. Therefore, there is prejudice to CIA result-

ing from CBI's inexcusable fourteen year delay.

Ultimately, as "[l]aches is an equitable doctrine[,] its existence depends on the particular equitable circumstance of each case. It is a question left to the sound discretion of the district judge whose determination will not be disturbed on appeal absent an abuse of that discretion." *Guardian Life Ins. Co. of America*, 943 F.Supp. at 518; *see University of Pittsburgh*, 686 F.2d at 1045. "[E]quity does not seek for general principles, but weighs the opposed interests in the scales of conscience and fair dealing." *Dwinell–Wright v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir.1943) (L.Hand, J.).

There are several relevant considerations here. *See generally Ocean Garden, Inc.*, 953 F.2d at 508 (factors include strength and value of trademark rights, plaintiff's diligence in enforcing mark, harm to plaintiff if relief denied, competition between parties, defendant's good faith, and harm suffered by defendant because of plaintiff's delay); 4 *McCarthy* § 31:22 (same). First, though CIA recently has taken imprudent actions (e.g., using and registering "National"), there is no evidence that from 1983 until at least August, 1996, CIA was other than a good faith user of the "Commerce" mark.[12] Second, as recently as June, 1997, when CIA complained to CBI about client confusion, CNIS was taking the position that there was no such confusion. (Aff. of Loser ¶ 19). Third, CBI clearly has not been diligent in protecting its mark. Again, as the "Commerce" mark's strength derives primarily from its marketplace recognition, it was incumbent upon CBI to try to keep the marketplace free of other users of the mark.

Fourth, since at least 1985, in reliance upon CBI's inaction, CIA has conducted and promoted its business, and established good will, under the name "Commerce Insurance Agency." Customer word of mouth about "Commerce Insurance Agency" has helped CIA grow. Prohibiting CIA from using the

---

11. Of course the fact of such a long delay also tends to undercut the claim that CNIS/CBI will suffer irreparable harm *pendente lite* if CIA is not enjoined from using the "Commerce" mark. *See generally* 4 *McCarthy* § 31:11 (discussing cases).

12. Even CIA's recent "imprudent" actions smack more of an attempt to shore up its position for a trademark infringement dispute or lawsuit than an attempt to ape CNIS/CBI and trade on CBI's goodwill and reputation.

mark will inflict a substantial hardship upon CIA. Fifth, although CNIS/CBI made a prayer for preliminary injunctive relief in its September 12, 1997, complaint, it did not actually file an application for preliminary relief until October 29, 1997. This delay suggests that CIA's use of the "Commerce" mark by itself in the insurance area has continued to be a use to which CBI has no strong objection. Finally, this Court is mindful that CNIS/CBI's lawsuit follows curiously close on the heels of both CBI's decision to become a major player in the New Jersey insurance industry and CIA's complaints to CBI about customer confusion.

The balance of the equities weighs in CIA's favor. Accordingly, CNIS/CBI is barred by laches from invoking its ownership rights to prevent CIA from using the "Commerce" mark. As will be explained more fully below, this Court is satisfied that laches should not be trumped here by the public interest in avoiding consumer confusion.

### F. *CIA's Application for a Preliminary Injunction Prohibiting CNIS from Using the "Commerce" Mark*

█ CIA seeks a preliminary injunction prohibiting CNIS from using the "Commerce" mark in connection with the sale of insurance. As was established above, CBI owns the "Commerce" mark. Since at least 1983, CBI has had the right to exclusive use of the "Commerce" mark in connection with insurance in New Jersey. Thus, CIA cannot assert ownership rights as against CBI or its subsidiary. That CNIS/CBI is barred by laches from (preliminarily) enjoining CIA's use of the "Commerce" mark does not change the result. CBI has been estopped from invoking its right to prevent CIA's use of the mark, but it has not lost its own rights in the mark. *TMT North America, Inc. v. Magic Touch,* 124 F.3d 876, 885 (7th Cir. 1997) ("Trademark law is unmistakably clear that '[a] laches or acquiescence defense does not divest the trademark owner of the right to use the mark but may deprive him or her

of any remedy for infringing uses by others.'") (quoting *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355–56 (E.D.N.Y.1994)). Therefore, this Court will deny CIA's application for a preliminary injunction prohibiting CNIS from using the "Commerce" mark in the insurance area.

### G. *Concurrent Use of the "Commerce" Mark*

█ Since both parties' applications for injunctions against the other's use of the "Commerce" mark are being denied, the parties will be permitted, *pendente lite,* to continue using the "Commerce" mark in their competing businesses. Wary "of putting a judicial stamp of approval on conduct which will confuse consumers," 4 *McCarthy* § 31:10, this Court will discuss briefly an argument not raised by either party: that the public interest in avoiding confusion should trump CIA's laches defense.

Laches may be trumped by the public interest in avoiding substantial consumer confusion. *See generally id.* For example, some courts of appeals have held that when dual use of a mark in competition results from estoppel by acquiescence—an equitable doctrine distinct from, but very similar to, laches [13]—the senior user's claim may be revived from estoppel upon a showing of "inevitable confusion" arising from continued dual use. *See TMT North America, Inc.,* 124 F.3d at 886; *SunAmerica Corp. v. Sun Life Assur. Co. of Canada,* 77 F.3d 1325, 1334 (11th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996); *see also Iodent Chem. Co. v. Dart Drug Corp.,* 207 U.S.P.Q. 602 (T.T.A.B.1980). Other courts have said that laches should not apply where the likelihood of confusion is not debatable or is not reasonably in doubt. 4 *McCarthy* § 31:10 (discussing cases).

However the necessary showing for trumping laches is styled, it has not been made here. While there clearly has been some

---

**13.** Acquiescence is distinct from laches in that it applies only where the senior user has given active or affirmative consent to the junior user's use of the mark. *See TMT North America, Inc.,* 124 F.3d at 885; *SunAmerica Corp. v. Sun Life Assur. Co. of Canada,* 77 F.3d 1325, 1334 (11th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996); *First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.,* 923 F.Supp. 693, 703 (E.D.Pa.1996); 4 *McCarthy* § 31:42.

showing of a likelihood of confusion, there is doubt as to whether it would be significant. Moreover, any confusion here is unlikely to be of a type which will work substantial harm to the public interest. A few consumers may experience some confusion, but it is highly unlikely that they actually will purchase a policy through CIA in the belief they are dealing with CNIS, purchase a policy through CNIS in the belief they are dealing with CIA, or be saddled with inferior insurance coverage because of confusion as to origin. Therefore, laches is not trumped by the public interest in avoiding consumer confusion.

Both parties' use of the "Commerce" mark now "stand in parity;" each party must treat the other's marks with equal dignity. *See SunAmerica,* 77 F.3d at 1334. In particular, CNIS/CBI must respect CIA's name and avoid creating confusion with it. *Id.* Accordingly, consistent with CIA's application, this Court will order CNIS *pendente lite* to stop using the abbreviated name "Commerce Insurance." This relief will help to prevent reverse confusion[14] and will not impose a hardship on CNIS.

### H. *CNIS/CBI's Application for a Preliminary Injunction Prohibiting CIA from Using the CIA Logo*

CNIS/CBI seeks an injunction preventing CIA from using the CIA logo. Disposition of this application is similar to the disposition of CNIS/CBI's application for an injunction prohibiting CIA from using the "Commerce" mark. The relevant inquiry is whether CIA's use of the CIA logo was likely to cause confusion in 1985—when CIA began using its confusingly similar logo. The weight of the *Scott Paper* factors favors a finding that in 1985 there was a substantial likelihood of

confusion. Indeed, the case for CNIS/CBI's preliminary injunction here is stronger because CIA is using an identical mark and a confusingly similar logo. Though CBI was not competing with CIA in the insurance business in 1985, it could have prevented CIA from using the CIA logo at that time because of the likelihood of confusion.[15] Today, since CBI has begun offering insurance services to the public, there is an even greater likelihood of confusion.

██ Irreparable harm flows from potential harm to, and loss of control of, CNIS/CBI's reputation, and deprivation of goodwill. *See id.* 920 F.2d at 195–96. The balance of hardships favors preliminary injunctive relief, as there is no substantial hardship to CIA. All CIA will have to do is change its letterhead and promotional materials, including any signs. CIA may continue to use "Commerce." The public interest is served by removing the risk of consumer confusion. *Id.* at 197–98. For these reasons, this Court will issue a preliminary injunction prohibiting CIA from using the CIA logo in physical proximity to the "Commerce" mark.

### I. *CIA's Use of "National"*

CNIS/CBI seeks a preliminary injunction prohibiting CIA from using the term "National." CIA's use of the term "National" is basically a non-issue at this stage in the case. Neither party has established rights to the term "National." It is clear that CIA never has been seriously interested in using the term "National." As CIA's use of the term promises to do nothing other than foster increased confusion, and as being prohibited from using "National" will work no hardship on CIA, this Court will enjoin CIA from

---

**14.** "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 474 (3d Cir.1994). Although CIA is not the "senior" user of "Commerce," it does have the right to use "Commerce" and the right to have CNIS avoid creating confusion, consistent with CNIS's concurrent use of "Commerce." Therefore, rec-

ognition of the risk of "reverse confusion" here is appropriate if not doctrinally precise.

**15.** CIA has not raised laches as a defense to CNIS/CBI's application for an injunction against CIA's use of the CIA logo, nor has CIA suggested that CBI was aware of CIA's use of the CIA logo prior to 1997, nor has CIA suggested that it has been prejudiced by any "delay" on CBI's part in objecting to CIA's use of the CIA logo.

**506**

using "National" as part of its service mark or business name.

## IV.  CONCLUSION

This Court will not preliminarily enjoin either party's use of the "Commerce" mark.

CIA will be enjoined from using the CIA logo in physical proximity to the "Commerce" mark, and will be enjoined from using the term "National."  CNIS will be enjoined from abbreviating its name as "Commerce Insurance."  This Court will enter an appropriate order.

APPENDIX