

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-13-2000

# Commerce Natl Ins v. Commerce Ins Agcy

Precedential or Non-Precedential:

Docket 99-5117

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Commerce Natl Ins v. Commerce Ins Agcy" (2000). *2000 Decisions.* Paper 129.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/129

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 13, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5117

COMMERCE NATIONAL INSURANCE SERVICES, INC.;
COMMERCE BANCORP, INC.

v.

COMMERCE INSURANCE AGENCY, INC.; COMMERCE
INSURANCE AGENCY OF SOUTH JERSEY, INC.

(District of New Jersey (Camden) Civil 97-4600)

COMMERCE INSURANCE AGENCY, INC.

v.

COMMERCE NATIONAL INSURANCE SERVICES, INC.

(District of New Jersey (Camden) Civil 97-4750)

Commerce Insurance Agency, Inc., and Commerce
Insurance Agency of South Jersey, Inc.,

      Appellants

On Appeal From the United States District Court
For the District of New Jersey
District Judge: Honorable Joseph E. Irenas

Argued: December 8, 1999

Before: SLOVITER, NYGAARD, and ROSENN,
Circuit Judges.

(Filed: June 13, 2000)

John F. Ward (Argued)
Ward & Olivio
708 Third Avenue
New York, New York 10017

Kenneth L. Winters
John G. Gilfillan, III
Carella, Byrne, Bain, Gilfillan,
Cecchi, Stewart & Olstein
6 Becker Farm Road
Roseland, NJ 07068
 Counsel for Appellants

Laurence S. Shtasel (Argued)
Dennis P. McCooe
Louis Charles Shapiro
Blank, Rome, Comisky & McCauley
 LLP
One Logan Square
Philadelphia, PA 19103
 Counsel for Appellees

OPINION OF THE COURT

ROSENN, Circuit Judge.

In an era of aggressive commercial competition, this appeal raises unsurprising, although important, issues of trademark confusion in the banking and insurance industries. Commerce Insurance Agency, Inc. (CIA), a small corporation engaged in the insurance business in Southern New Jersey for over thirteen years, sought an injunction in the United Sates District Court for the District of New Jersey prohibiting Commerce National Insurance Services (CNIS), a recently formed corporation, from using the "Commerce" mark to promote its insurance business. CNIS is a wholly owned subsidiary of Commerce Bancorp, Inc. (CBI) which had used the "Commerce" mark in connection with its banking services prior to CIA's adoption of the mark. The District Court denied CIA relief on the ground that CIA could not assert rights to the mark against either

2

CBI or CNIS because of CBI's prior use of the mark. CIA timely appealed. We will reverse.[1]

I.

A.

Commerce Bancorp, Inc. commenced operations in 1973 with the opening of a single branch in Marlton, New Jersey. In December of 1974, it began offering credit life insurance and credit disability insurance in connection with its lending services. By 1983, CBI had opened six branches and controlled more than $100 million in assets. By the time this litigation was commenced, CBI had opened more than fifty branches and exercised control over nearly $3 billion in deposits. Since January of 1973, CBI has promoted its banking services under the Commerce mark.

Commerce Insurance Agency commenced its insurance business in April of 1983, with a single office in Cedar Brook, New Jersey. After five years of growth, CIA moved to larger offices in Sicklersville, New Jersey. Since its establishment in 1983, CIA has promoted its insurance services under the "Commerce" mark.

From 1983 until 1996, CBI and CIA coexisted amicably in Southern New Jersey despite their use of the same mark to identify their respective services. CIA opened business accounts in its name with CBI, secured lines of credit from CBI, and rented a safe deposit box from it. CIA and CBI also referred customers to each other during this span of years. CIA's principal, Robert Loser, established a "good" relationship with a CBI branch manager and a "personal" relationship with CBI's regional vice president. This

_____

1. We have appellate jurisdiction under 28 U.S.C. 1291 and review the District Court's factual findings for clear error. See American Home Prods. Corp. v. Barr Lab., Inc., 834 F.2d 368, 370 (3d Cir. 1987). Clear error exists when giving all due deference to the opportunity of the trial judge to evaluate the credibility of witnesses and to weigh the evidence, we are left with a definite and firm conviction that mistake has been committed. See Versa Prods. Co. v. Bifold Co. , 50 F.3d 189, 209 (3d Cir. 1995).

3

relationship led to an invitation from CBI requesting CIA to participate in CBI's 5th Annual Commerce Golf Classic. CIA accepted the invitation, and CBI printed CIA's name as a contributor in CBI's annual program booklet as well as on a sign posted at the tournament. Throughout the thirteen year period between 1983 and 1996, neither CIA nor CBI were aware that anyone believed that the companies were business affiliates of each other.

On July 25, 1996, CBI announced its intention to enter into the general insurance services industry. Within one month of that announcement, CIA began taking steps designed to shore up its position for a potential trademark dispute. On August 26, 1996, CIA filed a service mark registration application with the United States Patent and Trademark Office seeking federal registration of the "Commerce" mark for insurance services. The application was granted. On August 28, 1996, CIA filed a service mark registration application with the New Jersey Secretary of State (the "Secretary") seeking state registration of the business name "Commerce Insurance Agency." The Secretary registered the name on September 3, 1996. On the same day, CIA filed a service mark registration application with the Secretary seeking registration of the business name "Commerce National Insurance Agency." The Secretary registered the name on September 11, 1996.

By November of 1996, CBI had acquired two existing insurance agencies from which CBI formally established CNIS. At this time, CNIS began promoting its services under the names "Commerce National Insurance Services" or "Commerce Insurance." In December of 1996, CBI purchased two additional insurance agencies and added them to CNIS. These additions made CNIS the 58th largest insurance agency in the United States, having a customer base of more than 38,000 individuals and businesses and maintaining more than $150 million of insurance coverage.

Instances of confusion between CIA and CNIS began to develop in 1997. In the early part of that year, CIA contacted an insurance carrier to track down a missing policy. On the assumption that CIA had been acquired by CBI, the carrier asked what CIA's agency code number had been prior to its purchase by CBI. Later, in May of that

4

year, CNIS and CIA began to receive each other's mail. CIA also began to receive telephone calls intended for CNIS. When CIA brought these instances of confusion to the attention of CNIS in June of 1997, CNIS denied the existence of any confusion.

B.

Shortly thereafter, however, CBI and CNIS filed a petition for cancellation of CIA's federal registration of the "Commerce" mark. CBI and CNIS also filed a complaint in the United States District Court contending, inter alia, that CIA's use of the Commerce mark infringed CBI's rights in the mark. CIA responded to the actions of CBI and CNIS by commencing an action of its own. In its complaint, CIA alleged, inter alia, that CNIS's use of the Commerce mark infringed CIA's rights in that mark.

The District Court consolidated the two actions, and the parties filed applications for preliminary relief based solely on the federal trademark issue.[2] CBI and CNIS sought preliminarily to enjoin CIA from using the Commerce mark to promote its insurance services. CIA, in turn, sought a preliminary injunction prohibiting CNIS from promoting its insurance services under the Commerce mark. After reviewing the parties' briefs and hearing oral argument, the District Court issued an opinion and order in which it declined to grant either CBI's and CNIS's request preliminarily to enjoin CIA from using the Commerce mark or CIA's request preliminarily to enjoin CNIS from using the Commerce mark.

In reaching its decision, the District Court first determined that CBI's rights in the Commerce mark were senior to those of CIA. The District Court concluded that, as of 1983, the time CIA began its use of the Commerce mark, CBI had established secondary meaning in the Commerce mark. See Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, 995 F. Supp. 490, 499 (D.N.J.

_____

2. Although the parties do not clearly identify the statute on which they base their claims, it appears that they charge a violation of the Lanham Act, 15 U.S.C. S 1125.

1998). Additionally, the Court found that CIA's use of the Commerce mark in 1983 was likely to create confusion, because reasonable consumers dealing with CIA "would have assumed that they were dealing with CBI or some CBI affiliate or offshoot." Id. at 499-501. Accordingly, the District Court concluded that CBI's rights to the Commerce mark were senior to those of CIA and that CBI's rights to the mark "encompassed" both the banking and insurance services industries. See id. at 501.

After reaching this conclusion, the District Court proceeded to determine whether CBI was entitled to preliminarily enjoin CIA from using the Commerce mark. In addressing this issue, the Court reasoned that CBI's fourteen year delay in enforcing its rights constituted laches and that therefore CBI was not entitled to the injunctive relief it sought. See id. at 503. Nevertheless, the District Court recognized that although CBI was estopped from invoking its right to prevent CIA from using the mark, it had not lost its rights in the mark altogether. See id. at 505. Accordingly, the Court held that although CBI was not entitled to a preliminary injunction against CIA, CBI's wholly owned subsidiary, CNIS, could not be preliminarily enjoined from using the Commerce mark by CIA. See id.

C.

Approximately eleven months later, the parties returned to the District Court seeking a final disposition of their claims. They entered into a stipulation requesting the District Court to enter a final judgment based on: (1) the record created in connection with the parties' cross applications for preliminary relief; (2) their respective expert reports (but without any testimony from either expert); and (3) supplemental briefs directed to the admissibility of those reports. The District Court obliged, and on January 20, 1999, it issued a final judgment in which it again declined to grant any party's request for injunctive relief with respect to the Commerce mark.

6

II.

On appeal, CIA contends that the District Court erred in concluding that CBI, by virtue of its use of the Commerce mark within the banking industry, acquired rights in the mark that extend to the insurance services industry. More specifically, CIA argues that the District Court committed clear error in finding that as of 1983 CBI had established: (1) secondary meaning in the Commerce mark within the insurance services industry; (2) ownership of the Commerce mark within the insurance services industry; and (3) that CIA's use of the Commerce mark was likely to create confusion in the minds of reasonable consumers. CIA requests this Court to reverse these findings and remand the case for consideration of its claim for injunctive relief against CNIS.[3]

III.

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir. 1983). A claim of trademark infringement is established when the plaintiff proves that: (1) its mark is valid and legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services. See Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990).

If the mark at issue is federally registered and has become incontestible, then validity, legal protectability, and ownership are proved. See Ford Motor Co. v. Summit Motor Prods., 930 F.2d 277, 292 (3d Cir. 1991). If the mark has not been federally registered or, if registered, has not achieved incontestability,[4] then "validity depends on proof

_____

3. CIA also requests that the case be remanded for consideration of its claim for damages. However, on the record before us, there seems to be no evidence as to the amount of damages CIA sustained.

4. A mark becomes incontestible after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for

7

of secondary meaning, unless the unregistered or contestable mark is inherently distinctive." 5 Id. A plaintiff must establish secondary meaning in a mark at the time and place that the defendant began use of the mark. See Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3d Cir. 1978); J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition S 15:4 (4th ed. 1997) [hereinafter "Trademarks"].

Secondary meaning exists when the mark "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." Scott Paper Co. at 1228. In general, it is established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark. See id. Under certain circumstances, a mark "can develop secondary meaning as to goods or services to which the mark has not been applied." Id. The rationale for extending protection of a mark into a noncompeting market are the potential dangers that: "(1) the reputation of the holder of the mark may be tarnished or (2) the user of an infringing mark may be attempting to benefit from the general goodwill developed by the holder of the protected mark." Id.

Although there are numerous cases discussing secondary meaning, there is not yet a consensus as to its specific elements. See Ford Motor Co., 930 F.2d at 292. A non-exclusive list of factors which may be considered includes: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer

---

five consecutive years subsequent to registration, that there is no pending proceeding contesting the owner's rights to registration, and that there has been no adverse decision concerning the registrant's ownership or right to registration. See 15 U.S.C. SS 1058, 1065; Fisons Horticulture, Inc. v. Vigoro Indus., 30 F.3d 466, 472 n. 7 (3d Cir. 1994).

5. A mark is inherently distinctive if it may be fairly characterized as arbitrary, fanciful, or suggestive. See Ford Motor Co., 930 F.2d at 292 n. 18. Neither CBI, CNIS, nor CIA contends that the Commerce mark is inherently distinctive.

testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion. See id.

"With respect to ownership of an unregistered mark, the first party to adopt a mark can assert ownership so long as it continuously uses the mark in commerce." Ford Motor Co., 930 F.2d at 292. However, where a senior user of a mark later expands into another industry and finds an intervening junior user, priority in the mark in the second industry depends on whether the senior user would normally or reasonably have been expected to expand into that industry. See J. Wise and Sons Co. v. W. E. Bassett Company, 462 F.2d 567, 569 (C.C.P.A. 1972). This, in turn, depends on whether the nature of the industries was such that purchasers would reasonably expect the services rendered by these industries to originate from a common source. See id. at 569; see also McCarthy, Trademarks, S 16:5; Volkswagenwerk Aktiengessellschaft v. Wheeler, 814 F.2d 812, 815 (1st Cir. 1987).

In addition to establishing validity and ownership,"a plaintiff must also prove likelihood of confusion, which is said to exist `when the consumers viewing the defendant's mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " Ford Motor, 930 F.2d at 292 (quoting Scott Paper Co., 581 F.2d. at 1229). The likelihood of confusion analysis requires the evaluation of a number of factors including: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other

9

facts suggesting that the consuming public might expect the prior owner to expand into the defendant's market. See Scott Paper, 589 F.2d at 275.

IV.

We now turn to the District Court's specific findings of fact with respect to secondary meaning, ownership, and likelihood of confusion.

A.

After concluding that CBI's use of the "Commerce" mark "is not inherently distinctive and does not have great conceptual strength," the District Court found that the mark "does have substantial marketplace recognition value in New Jersey." Commerce Nat'l Ins. Servs. , 995 F.Supp. at 499. In elaborating on this point, the Court continued:

> Consumers viewing the term "Commerce" in front of a bank, in connection with banking more generally, or in a headline or article in a newspaper business section may well assume they are dealing with CBI. Still, given the frequency with which consumers see the term "Commerce" -- and similar marks such as "Commercial" -- they likely have come to recognize that different goods and services identified by the term "Commerce" mark may have different origins. On balance, this Court concludes that the "Commerce" mark, by virtue of its marketplace recognition, was fairly strong in 1983 -- when CIA was founded-- and is stronger today. It will be protected in connection with banking and financial services. It also will be protected in connection with some products and services which are closely related to banking and financial services in the minds of consumers.

Id.

Although the Court never specifically labeled the above rationale as its secondary meaning analysis, the parties agree that the language reflects the District Court's findings in this regard. The parties disagree, however, over the soundness of those findings. Naturally, CBI argues that

10

they are firmly supported by the evidence of record; CIA argues to the contrary.

We believe that CIA has the more credible position. In our view, CBI failed to produce a sufficient quantum of evidence from which the Court could reasonably conclude that CBI had established secondary meaning in the "Commerce" mark within the general insurance services industry as of 1983, the year in which CIA was established.

CBI offered no evidence as to the extent to which it had promoted the "Commerce" mark by 1983. The only specific figure provided in the record involves the year of 1996, thirteen years later, when CBI claims to have spent more than $4 million to promote its services under the "Commerce" mark. The amount of money spent promoting the mark after 1983, however, is irrelevant. See Scott Paper Co., 589 F.2d at 1231; McCarthy, Trademarks , S 15:4. CBI attempts to divert attention from this irrelevant fact by pointing to a sentence in the District Court's opinion which states: "CBI has promoted the `Commerce' mark . . . widely through customer services, promotional materials, advertisements, and community service activities." Commerce Nat'l. Ins. Servs., 995 F. Supp. at 494. That statement, however, does not demonstrate that CBI had promoted the "Commerce" mark before 1983. Moreover, even if it were so intended, it would be clearly erroneous because there is no evidence of record to support such a finding.

CBI's proof as to secondary meaning was deficient in other respects as well. First, CBI was unable to produce a single instance of actual confusion between it and CIA. The only evidence of actual confusion in this case relates to the dispute between CIA and CNIS. Although evidence of actual confusion is but one factor in the secondary meaning analysis, see Ford Motor Co., 930 F.2d at 292, CIA's and CBI's harmonious coexistence in the same geographical area for thirteen years most certainly cuts against CBI's claim to secondary meaning within the insurance services industry. Second, CBI offered no evidence to demonstrate that trade journals or other publications referred to it as "Commerce" in 1983. Instead, CBI offered two newspaper articles published in 1996. Although those articles do refer

11

to CBI as "Commerce," they do not aid in determining whether CBI was commonly identified by consumers as "Commerce" during the time period relevant to these actions.

CBI also makes much of the "fact of copying" (i.e. the fact that CIA also uses the "Commerce" mark in its business name), but there is no evidence that CIA intended to leach off the goodwill of CBI by appropriating its mark. To the contrary, CIA limited the mark's use to general insurance services, a use to which CBI consciously acquiesced for thirteen years. Moreover, as noted by the District Court, the "Commerce" mark is not particularly distinctive. It is a common term used nationally in connection with a variety of businesses, and is even prominently embedded in our federal constitution. CIA's election to use such a commonplace term in naming its insurance agency is no more evidence of copying than was CBI's choice of the mark. At most, it is only minimally probative of whether CBI established secondary meaning in the "Commerce" mark in 1983.

CBI also points to a recent customer satisfaction survey as evidence supportive of the District Court's finding that the mark achieved secondary meaning. However, CBI's reliance on that survey is misplaced because the survey is wholly irrelevant to whether CBI established secondary meaning in the "Commerce" mark as of 1983. First, based on the recency of the survey, it follows that it is not particularly probative of customer views in 1983. Second, and more importantly, customer surveys and customer testimony are relevant to the secondary meaning inquiry only insofar as they are probative of the strength of the "Commerce" mark in the collective consumer consciousness. The satisfaction of customers with CBI's services does little to demonstrate that when customers see the word "Commerce" they associate it with CBI.

Finally, CBI also argues that the District Court did not clearly err in finding secondary meaning because at the time CIA began using the "Commerce" mark, CBI had already been using the mark for ten years; CBI's use of the mark was exclusive in the New Jersey service area with respect to banking; and, CBI was a relatively large bank

12

controlling over $100 million in assets. Although this evidence is probative of secondary meaning, it nevertheless is insufficient to support a finding of secondary meaning. CBI is attempting to establish secondary meaning in the non-competing insurance services industry, not the banking industry. Moreover, CBI is also attempting to establish rights to a commonplace, descriptive term used by a variety of businesses in a variety of contexts. In these circumstances, the evidentiary bar must be placed somewhat higher. See McCarthy, Trademarks, S 15:28. ( "[A]s a general rule of thumb, the more descriptive the term, the greater the evidentiary burden to establish secondary meaning.")

CBI offered no evidence that trade journals or other publications referred to it as "Commerce" in 1983. The record likewise reveals not a single CBI customer who ever confused CIA with CBI. Nor does the record contain any evidence as to the extent of CBI's promotional and advertising activities prior to 1983. In the absence of any evidence on these matters, CBI's status as a relatively large bank is insufficient to support the finding that CBI established secondary meaning in the Commerce mark with respect to the general insurance services industry.

B.

Turning now to the District Court's determinations with respect to ownership and likelihood of confusion, it found that CBI's rights in the Commerce mark were senior to those of CIA because CIA's use of the mark, as of 1983, created a likelihood of confusion. In so finding, it appears that the District Court conjoined its analysis of ownership with its analysis of likelihood of confusion. Although these are distinct elements of a trademark infringement claim, the District Court's choice not to separate them is of little consequence because the findings turn on substantially the same evidence. See McCarthy, Trademarks S 16:5 (noting that when a senior user of a mark expands into a second service industry and finds an intervening junior user of the mark, ownership in the second industry is determined by whether the expansion is "natural" in that customers would have been confused as to source or affiliation at the time of

13

the intervening user's appearance). Nevertheless, because we believe the evidence presented by CBI insufficient to demonstrate a likelihood of confusion, we conclude that the Court's finding as to both of these elements was clear error.

The District Court appears to have rested its finding of a likelihood of confusion primarily on the assumption that banking and insurance are similar industries in the minds of consumers and that consumers would expect banks to expand into the insurance industry. In this connection, the District Court stated that because "[t]he composite phrase `Banking and Insurance' probably has resonance in the consumer mind" and because "[c]onsumers have long been aware that banks seek to expand territorially and in terms of the products and services they offer . . . many reasonable consumers encountering `Commerce' in connection with insurance and financial planning would have assumed they were dealing with CBI or some offshoot." Commerce Nat'l Ins. Servs., 995 F.Supp. at 501.

This speculative rationale amounts to little more than an assumption of consumer behavior for which there is little substantive proof of record. CBI's only evidence that a reasonable consumer in 1983 would have expected banks to expand into the insurance industry consisted of (1) a single affidavit in which CNIS's president and CEO stated that CBI offered credit life insurance and credit disability insurance beginning in December of 1974 and (2) an unpersuasive report from CBI's expert who concluded that reasonable consumers in 1983 would have expected banks to sell insurance. This evidence is insufficient to support a finding of likelihood of confusion for several reasons.

First, although the affidavit of CNIS's president and CEO establishes that CBI offered credit life insurance and credit disability insurance in support of its loans to its banking customers, it does little to demonstrate that reasonable consumers in 1983 would have also expected CBI to be selling insurance generally, including the huge variety of liability and risk insurance. Likewise, CBI's expert's report does little to aid the inquiry. Although the report does list several surveys reflecting consumer attitudes and expectations with respect to the banking industry, only one of those surveys was taken during the time period relevant

14

to this action. That survey, taken in October of 1978, reflects that ". . . 94.2% of respondents replied they thought credit insurance was a good thing, the large majority without any qualifications." The survey does not, however, aid in a determination that consumers in 1983 expected banks to be engaged in the general insurance industry because it simply reveals that some consumers believed credit life insurance was "a good thing." It says nothing about the extent to which the consumers believed banks to be engaged in the insurance business. Moreover, even if it did, it is not at all clear that the impressions of the respondents in that survey reflected how New Jersey consumers viewed the banking industry.[6]

It is also important to note that New Jersey law severely limited banks from engaging in the general insurance industry at the time CIA was formed. By statute, see e.g. N.J.S.A. SS 17:3C-1 and 17:19A-213.1 (West 1984), banks could not sell general insurance services or products until 1996 when the United States Supreme Court decided Barnett Bank of Marion County v. Nelson, 517 U.S. 25 (1996). This prior statutory bar eviscerates the possibility that prior to 1996 southern New Jersey consumers reasonably expected CBI to engage in the insurance industry. Moreover, it is apparent that CBI had no expectation of engaging in the general insurance industry until the Barnett decision in 1996.

Furthermore, not only was CBI's evidence of a likelihood of confusion insufficient, but there was also other evidence tending to suggest there was no danger of confusion between CIA and CBI in 1983. A review of the record reveals not a single instance in which a consumer actually confused CIA with CBI. To the contrary, the record reveals that, from 1983 through 1996, CBI and CIA coexisted amicably, even referred customers to one another, and operated in their respective spheres of interest without any

_____

6. As noted, CBI's expert did conclude in his report that a reasonable consumer would have expected CBI to be engaged in the insurance business; however, his report failed to set forth a sufficient basis from which to reasonably draw that conclusion and therefore offers little support of consumer confusion.

15

confusion. Confusion only developed early in 1997 after CBI elected to enter the insurance business by forming CNIS. CBI attempts to undercut the impact of the lack of evidence of confusion prior to CNIS's entry into the New Jersey insurance market by arguing that the parties' investigation into the matter was minimal. This argument, however, ignores that the burden of proving likelihood of confusion rested on CBI.

CBI also attempts to make much of the similarity between the marks of the two companies. However, until CBI decided to enter the insurance industry, neither party challenged the other's use of the mark. Of course, the Commerce mark is the same no matter who uses it, but this evidence is not particularly probative of a likelihood of confusion because Commerce is a commonplace mark used by countless businesses in countless contexts. The District Court conceded as much during its analysis of the mark and noted that "given the frequency with which consumers see the term `Commerce' . . . they likely have come to recognize that different goods and services identified by the term `Commerce' may have different origins." See Commerce Nat'l Ins. Servs., 995 F.Supp. at 499.

Finally, as noted above, there is little evidence from which one could conclude that CBI's Commerce mark was particularly strong in 1983. CBI offered no customer surveys or testimony tending to suggest that the consuming public readily identified the Commerce mark with CBI. Nor did CBI offer any evidence as to the extent to which it had promoted the Commerce mark prior to CIA's entry into the insurance market. Because the Commerce mark is not inherently distinctive and because CBI adduced no evidence to demonstrate that the mark had developed significant marketplace recognition prior to 1983, it is difficult to conclude that the mark was particularly strong.

In sum, the record is critically deficient of that minimum quantum of evidence from which the District Court could have reasonably found that CIA's use of the Commerce mark in 1983 resulted in a likelihood of confusion. CBI had an opportunity to undertake discovery and to prepare for a trial. Instead, it chose, along with CIA, to run the risk of relying on the slender record presented with its request for

16

a preliminary injunction. That record supports neither the findings of secondary meaning, ownership, nor likelihood of confusion. As Judge Learned Hand observed in Federal Telephone & Radio Corp. v. Federal Television Corp. , 180 F.2d 250 (2d Cir. 1950), which involved a suit by Federal Telephone & Radio Corp. to enjoin the defendant as the junior user of the name "Federal:" "we should have no warrant for depriving the defendant of whatever good-will it has already acquired by its sales under its own name. It started the use in entire good faith, the word is in general use for all sorts of purposes, and the plaintiff 's pretension to monopolize it is without any present basis that we can discover." Id. at 251-151. Accordingly, it was error to conclude that CBI possessed rights to the exclusive use of the Commerce mark in the insurance services industry.

V.

We now turn to the merits of CIA's claim against CNIS. The non-existent rights of CBI can no longer serve to shield its wholly-owned subsidiary, CNIS, from liability. CIA contends that CNIS's use of the Commerce mark infringes CIA's rights in the mark because CNIS's use of the mark results in reverse confusion. CIA is entitled to a remand on this claim only if the record contains sufficient evidence from which the District Court could reasonably conclude that: (1) CIA's Commerce mark is valid and legally protectable; (2) CIA owns the Commerce mark; and (3) CNIS's use of the Commerce mark results in reverse confusion. See Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 474 (3d Cir. 1994) (adopting the doctrine of reverse confusion); Sun Shipbuilding & Dry Dock Co. v. McCabe, 593 F.2d 234, 239 (3d Cir. 1979) (noting that a remand is unnecessary where evidence of record would not support a finding in favor of party seeking remand). We address each of these issues in turn.

A.

Although CIA has registered the Commerce mark with the United States Patent and Trademark Office, the mark has yet to achieve incontestability. Therefore, to

17

demonstrate that the Commerce mark is valid and legally protectable, CIA must demonstrate that it had established secondary meaning in the Commerce mark as of 1996, the year in which CNIS began use of the mark. See Ford Motor Co., 930 F.2d at 292. Although CIA's evidence of secondary meaning suffers from some of the same weaknesses as CBI's proof, we think CIA's evidence sufficient to permit a finding that CIA has established secondary meaning in the Commerce mark within the insurance services industry.

Unlike CBI, CIA is not attempting to establish secondary meaning in the Commerce mark with respect to services which it has yet to offer. Rather, CIA is simply asserting that it has established secondary meaning in the Commerce mark with respect to the insurance services it had offered under that mark for thirteen years prior to the formation of CNIS and continues to offer. We think it a reasonable inference that during those thirteen years CIA was able to build up substantial good-will for its general insurance services under the Commerce mark.7 It not only sold general insurance continuously during this period but also expanded to larger offices. Moreover, we note that in the context of a reverse confusion case, the evidentiary burden upon a smaller, senior user to establish the existence of secondary meaning is placed somewhat lower. See Elizabeth Taylor Cosmetics Company, Inc. v. Annick Goutal, 673 F.Supp. 1238, 1248 (S.D.N.Y. 1987)("[A] minimal showing of secondary meaning is required in a reverse confusion case."). Otherwise, "a larger company could with impunity infringe the senior mark of a smaller one." Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 491 (2d Cir. 1988).

For these reasons, we conclude that CIA's proffered evidence is sufficient to support a finding of secondary meaning in the insurance industry.

_____

7. Although that good-will may be limited geographically to an area no greater than southern New Jersey, the fact remains that, within that area, CIA has offered sufficient evidence from which a finding of secondary meaning can be made.

18

B.

Turning now to the question of ownership, there is sufficient evidence in the record from which the District Court may reach the conclusion that CIA owns the Commerce mark within the insurance services industry of southern New Jersey. CIA began using the mark in that industry in 1983; CNIS did not commence its use until 1996.

C.

Finally, we turn to the issue of reverse confusion. This Court adopted the doctrine of reverse confusion in Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466 (3d Cir. 1994). In so doing, we explained that "[r]everse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." Id. at 474. Quoting the Sixth Circuit's decision in Ameritech, Inc. v. American Information Technologies Corp., 811 F.2d 960, 964 (1987), we elaborated:

> the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark -- its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

Id. at 474-75.

After adopting the doctrine of reverse confusion, we proceeded to assess the plaintiff 's reverse confusion claim in light of the Scott Paper factors. In doing so, we acknowledged that certain of these factors must be reworked in the context of a reverse confusion case. For example, when applying the strength of mark factor, the lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is

19

the strength of the larger, junior user's mark which results in reverse confusion. See id. at 479. Likewise, the intent inquiry must also be altered to focus on whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name search for other companies marketing similar goods or services under that mark. See id. at 480.

Consideration of CIA's reverse confusion claim in light of these modified Scott Paper factors reveals that there is a significant likelihood of reverse confusion in this case. CIA and CNIS are engaged in the same line of business. In addition, the "Commerce" mark used by the parties is identical. Although CNIS has added the words "National" and "Services" to its mark, the record reveals that instances of confusion between CIA and CNIS have already occurred despite the addition of these terms.

CNIS's ability to promote its mark is also much greater than that of CIA's. The formation of CNIS was immediately followed by two newspaper articles providing accounts of CBI's expansion into the insurance industry through the formation of CNIS. In addition, CBI has boasted that it spent $4 million to promote the "Commerce" mark in 1996. Although these funds appear to have been spent promoting the mark in connection with CBI's banking services, it is likely that similar funds will be used in the future to promote the mark in connection with CNIS's insurance activities. Moreover, it is also possible that CNIS will have a substantial advertising budget of its own. In the short period of its existence, CNIS already has become the 58th largest insurance agency in the nation, serving more than 38,000 individuals and businesses. Although the exact size of CIA is not known, it is obvious that CIA does not have similar resources to develop a high-powered promotional campaign.

Furthermore, CBI was well aware of CIA and its mark when it decided to form CNIS and enter the general insurance services market. The two had known each other for years; they had done business with each other; they had referred individuals and businesses to each other. CBI made a conscious decision to track the CIA name for its subsidiary, merely adding "National" when it entered the

20

insurance industry. It is not entirely clear whether CBI's motive was to push CIA out of the market or whether CBI simply saw an opportunity to promote both its insurance and banking activities under a common mark. Nevertheless, the doctrine of reverse confusion is designed to prevent the calamitous situation we have here-- a larger, more powerful company usurping the business identity of a smaller senior user. See Fisons , 30 F.3d at 474 ("Without recognition of reverse confusion, smaller senior users would have little protection against, larger more powerful companies who want to use identical or confusingly similar trademarks.").

In sum, there is ample evidence of record that CNIS's use of the "Commerce" mark will result in reverse confusion. CNIS by virtue of its superior size, resources, and economic strength, as well as the support of its powerful and aggressive parent, may be able to saturate the market with advertising so that the public will likely believe that CIA is an affiliate of CNIS or possibly an interloper.

VI.

Accordingly, for the reasons set forth above, the District Court's order denying CIA's request for an injunction against CNIS from using the Commerce mark will be vacated and the case remanded for further proceedings as are consistent with this opinion.

Upon remand, the District Court should make appropriate findings of fact as to whether (1) CIA has sufficient secondary meaning in the Commerce mark in the insurance industry, (2) the ownership of the mark, and (3) the likelihood of confusion in the use of the Commerce mark by CNIS, either in its name as presently formed or modified. As the concurrence observes, nothing in this opinion precludes the District Court on remand, if the evidence so warrants, from permitting CNIS to continue doing business under the "Commerce National Insurance Services" name. If, on the other hand, the Courts concludes that CIA's evidence establishes the foregoing elements of the trademark infringement claim, then it should grant CIA appropriate equitable relief.

21

Costs taxed against Commerce National Insurance
Services, Inc. and Commerce Bancorp, Inc.

22

SLOVITER, Circuit Judge, concurring.

I write merely to make clear my understanding of what the court's opinion will allow the District Court to do on remand. In its judgment, the District Court enjoined CIA from using the term "National" as part of its service mark and/or business name. At the same time, the District Court enjoined CNIS from using the abbreviated business name and/or service mark "Commerce Insurance." Neither party objected on appeal to those portions of the District Court's order. I join the majority's opinion because I understand that nothing therein would preclude the District Court, on remand, from permitting CNIS to continue doing business under the name "Commerce National Insurance Services."

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

23